**In re April L. FRANKLIN, Debtor.**

**Bankruptcy No. 97–07373.**

United States Bankruptcy Court, N.D. Florida, Tallahassee Division.

Oct. 8, 1997.

Laura Beth Faragasso, Tallahassee, FL, for FL. Commerce.

L. William Porter II, Havana, FL, for Debtor.

Leigh D. Hart, Tallahassee, FL, trustee.

### *ORDER OF VALUATION*

LEWIS M. KILLIAN, Jr., Bankruptcy Judge.

THIS MATTER is before the Court on the Motion to Value Collateral filed by Florida Commerce Federal Credit Union (the Credit Union) with respect to a 1995 Jeep Grand Cherokee automobile, which the debtor in this Chapter 13 case proposes to retain under her Chapter 13 plan. Pursuant to Local Rule 3012–1(B)(formerly Local Rule 408(B)) the debtor gave notice to the Credit Union of her intent to value the vehicle at $14,000, based on classified ads and the NADA book. The Credit Union, in its motion to value, asserts a value of $19,213.68. Both parties have submitted affidavits to support their respective positions and have requested that this matter be decided on the affidavits without further evidence.

The vehicle in question was purchased from a dealership by the debtor on February 8, 1997, for a purchase price of $18,568.00. Along with the vehicle, the debtor purchased an extended warranty for three (3) years or 36,000 miles, at a cost of $971.56. The war-

ranty is fully transferrable upon the sale of the vehicle. The vehicle had approximately 36,000 miles on it at the time of purchase, and approximately 50,000 miles at the time of the bankruptcy. According to both the debtor's and Credit Union's experts, the vehicle has transmission problems, malfunctioning power windows, cigarette burns on the upholstery, and some exterior dents. The debtor's expert put the value of a new transmission at $2,500.00, while the Credit Union's expert estimated total repair/reconditioning costs at $1,600.00. However, neither party has submitted an estimate from a transmission repair shop, thus, any estimate as to the actual cost for repairing the transmission is purely speculative. Furthermore, there is no indication as to whether or not any of the mechanical repairs would be covered under the extended warranty.

While the Credit Union's initial motion to value asserted a value of $19,213.68, the affidavit of Wayne Andrews, the Credit Union's expert, sets forth a replacement value of $17,000.00. This was based on calculations using the July 1997 NADA guide, the June 1997 Kelly Blue Book Guide, and sales records for six (6) transactions involving similar vehicles sold at retail in Tallahassee during May, June and July, 1997.

The debtor's expert, Bobby Thompson, based his opinion on the June 1997 NADA Guide, with deductions for the needed repairs and his opinion that the demand for this make and model vehicle is way down. In the worksheet supporting his opinion, Mr. Thompson utilized the June 1997 NADA Guide which lists the base average retail price for the vehicle at $18,550.00, and the trade-in (wholesale) value at $15,900.00. Based on mileage of approximately 50,000, those prices were adjusted downward by $600.00 based on the high mileage tables. Then he made adjustments although not itemized, for repairs and his evaluation of the demand, and came up with his opinion of $14,000.00 if the repairs were made to the vehicle.

■ This case squarely presents me with the issue as to how the valuation standard set forth by the Supreme Court in *Associates Commercial Corp. v. Rash,* —— U.S. ——, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997) is to be applied. In *Rash,* the Court held that for purposes of valuation, the value of property to be retained by a debtor under Chapter 13's "cramdown option" is the replacement of that item. However, the Court did not identify exactly how the replacement value is to be arrived at except to state that it "is the cost the debtor would incur to obtain a like asset for the same 'proposed.... use.'" *Id.* at ——, 117 S.Ct. at 1886.

In *In re Rowland,* 166 B.R. 172 (Bankr. N.D.Fla.1994), I determined that with respect to valuation of mobile homes, the starting point in such valuation should be the average between the retail and wholesale values, with upward or downward adjustments made if called for by special circumstances. *Rowland* at 176. The application of that standard was extended to valuation of automobiles in *In re Cook,* 205 B.R. 437 (Bankr.N.D.Fla.1997). In arriving at that starting point for valuation, I found that such a price best reflected what the collateral could be sold or obtained for on the open market, and not necessarily at a retail sale from a dealer. Included in dealer retail prices are a wide variety of costs including advertising, repair, sales commissions, and other costs of retail business. *Rowland* at 176.

In deciding *Rash,* the Court expressly rejected what it perceived to be a rule establishing valuation as the midpoint between foreclosure value and replacement value, as set forth by the Seventh Circuit in *In re Hoskins,* 102 F.3d 311 (7th Cir.1996) and the Second Circuit in *In re Valenti,* 105 F.3d 55 (2nd Cir.1997). The difficulty with this analysis is that neither *Hoskins* nor *Valenti* utilized the terms "foreclosure value" and "replacement value" in their decisions. In both of those cases, in which automobiles were involved, the Courts were utilizing a midpoint between *retail* and *wholesale* valuations. While at first blush, one may be quick to conclude that replacement value and retail value are synonymous, the Supreme Court, in footnote 6, makes it clear that they are not the same. In footnote 6, the Court says:

Our recognition that the replacement value standard, not the foreclosure value stan-

dard, governs in cramdown cases leaves to bankruptcy courts, as triers of fact, identification of the best way of ascertaining replacement value on the basis of the evidence presented. Whether replacement value is the equivalent of retail value, wholesale value, or some other value will depend on the type of debt and the nature of the property. We note, however, that replacement value, in this context, should not include certain items. For example, where the proper measure of the replacement value of a vehicle is its retail value, an adjustment to that value may be necessary: a creditor should not receive portions of the retail price, if any, that reflect the value of items the debtor does not receive when he retains the vehicle, items such as warranties, inventory storage, and reconditioning. *Cf.* 90 F.3d, at 1051–1052. Nor should the creditor gain from modifications to the property e.g., the addition of accessories to a vehicle—to which a creditor's lien would not extend under state law. *Rash,* —— U.S. at ——, 117 S.Ct. at 1886. In expressly recognizing that several components go into retail pricing that should not be included as a part of the replacement value of collateral, the Supreme Court has allowed bankruptcy courts to move the appropriate measure of replacement value back to some point between wholesale and retail values. Since the rule I announced in *Rowland* does not absolutely fix the value at the midpoint between retail and wholesale, but merely utilizes that as a starting point based on a recognition that such a value more closely approximates a price available in an open market rather than purely a retail market, I do not believe that the decision in *Rash* dictates any change in methodology.

Based on the June 1997 NADA book, the average of the retail and wholesale value for the instant vehicle, deducting $600.00 for high mileage and adding $200.00 for custom wheels, is $16,825.00. Based on the evidence of the vehicle's condition and repair needs, I find that a $2,000.00 deduction is appropriate. The prorated value for the extended warranty protection should be added back into the value, but not at the ratio urged by the credit union. The credit union seeks to have the value of the warranty prorated based on the number of months (32) remaining, which would give it a value of $863.68. However, between the time of purchase and the time of the bankruptcy, the debtors put approximately 14,000 miles on the vehicle while the warranty is limited to 36,000 miles. Thus, the value of the warranty should be reduced by 39%, resulting in a value for the remaining warranty of $593.00. With that sum added back into the values previously found, the replacement value for the vehicle is $15,418.00, Accordingly, it is hereby

ORDERED AND ADJUDGED that the value of the 1995 Jeep Cherokee for purposes of confirmation of the Chapter 13 plan is $15,418.00.

DONE AND ORDERED.