**In re Freddye Lanette YOUNGER, Debtor.**

**Bankruptcy No. BK–97–18955–LN.**

United States Bankruptcy Court,
W.D. Oklahoma.

Jan. 12, 1998.

Richard S. Winblad, Oklahoma City, OK, for AMN Receivables Financial Corp.

Michael J. Rose, Oklahoma City, OK, for Debtor.

Letha Sweeney, Oklahoma City, OK, for Standing Chapter 13 Trustee.

### ORDER ON REQUEST FOR VALUATION OF ASSET IN CHAPTER 13 CASE

PAUL B. LINDSEY, Bankruptcy Judge.

### BACKGROUND

■ Debtor commenced this case on September 8, 1997, by filing a voluntary petition under Chapter 13 of the Bankruptcy Code.[1] In the petition, debtor listed ownership of a 1995 Chevrolet Lumina Minivan, in which creditor AMN Receivables Financial Corp. ("AMN") holds a security interest. Debtor scheduled the vehicle as having a value of $11,988 at the date of filing, and proposed in a Chapter 13 plan to retain the vehicle and to pay that amount to AMN, with interest at 12% per annum. On November 7, 1997, AMN filed its objection to confirmation of debtor's plan and its motion for valuation hearing with regard to the vehicle. In its motion, AMN asserted that the retail value of the vehicle as it is equipped, according to the National Association of Automobile Dealers ("NADA") Official Used Car Guide (Southwest Edition, September 1997), was $14,575.[2] AMN also asserted that its contract rate of interest, 17.99% per annum, represented the market rate which debtor must pay under the plan.[3]

Debtor's proposed Chapter 13 plan would invoke the "cram down" option permitted by § 1325(a)(5)(B). That provision allows a debtor to retain collateral securing a claim, even though the holder of the claim has not accepted the plan, if the plan provides that the holder of the claim retains the lien securing the claim and "the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim." Section 1325(a)(5)(B)(ii). The allowed amount of a secured claim is determined pursuant to § 506(a).[4]

In *In re Myers*, 178 B.R. 518 (Bankr. W.D.Okla.1995), a Chapter 13 case involving, as here, a vehicle sought to be retained by debtor for personal use, this court addressed the appropriate means of determining "value," a term not defined in the Bankruptcy Code or Rules. After discussion and consideration of the then current authorities, this court reaffirmed its adherence to the rule adopted in *In re Stauffer*, 141 B.R. 612 (Bankr.N.D.Ohio 1992): That the starting point for valuation of personal vehicles in Chapter 13 cases should be the average of the wholesale, or trade-in, and the retail values contained in the most current available NADA, or other equally reliable "book" providing such information for such vehicles. *Myers*, 178 B.R. at 524. This court consistently applied that rule from more than two years prior to the issuance of *Myers*, and thereafter to mid-June 1997, when the Su-

1. References herein to statutory provisions by section number alone will be to the Bankruptcy Code, 11 U.S.C. §§ 101 et seq., unless the context indicates otherwise.

2. On November 17, 1997, AMN filed a proof of claim, in the total amount of $16,857.88, asserting a secured claim to the extent of $15,512.55, an amount representing the alleged value of its security interest in the subject vehicle, $14,575, in addition to its security interest in an extended warranty contract having an alleged value of $712.55, the balance to be unsecured. At the hearing on valuation, the parties announced agreement as to the value of the extended warranty contract. The only issue remaining to be decided by the court, therefore, is the value of the vehicle.

3. This court's decision in *In re Smith*, 192 B.R. 563 (Bankr.W.D.Okla.1996) controls the interest

rate issue. No evidence having been presented to the court indicating that the current market rate of interest would be other than the contract rate, debtor will be required to pay that rate if the vehicle is to be retained.

4. Section 506(a) is, in material part, as follows:

(a) An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property . . . and is an unsecured claim to the extent that the value of such creditor's interest . . . is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

preme Court decided *Associates Commercial Corporation v. Rash*, —— U.S. ——, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997).

## THE RASH DECISION

In an *en banc* decision, the Court of Appeals for the Fifth Circuit had held that when a Chapter 13 debtor seeks to retain and use collateral over the objection of a secured creditor, the collateral was to be valued under § 1325(a)(5)(B) by assessing what the secured creditor could obtain in a foreclosure sale of the property. *Associates Commercial Corp. v. Rash (In re Rash)*, 90 F.3d 1036 (5th Cir.1996)(en banc). Other Courts of Appeals had followed a replacement or fair market value approach. *See Winthrop Old Farm Nurseries, Inc. v. New Bedford Institution for Savs. (In re Winthrop Old Farm Nurseries, Inc.)*, 50 F.3d 72 (1st Cir.1995) (replacement value); *Metrobank v. Trimble (In re Trimble)*, 50 F.3d 530 (8th Cir.1995) (replacement value); *In re Taffi*, 96 F.3d 1190 (9th Cir.1996) (fair market value). In *In re Hoskins*, 102 F.3d 311 (7th Cir.1996), the proper approach was said to be valuation of collateral at the midpoint between foreclosure and replacement values.[5] Finally, in *General Motors Acceptance Corp. v. Valenti (In re Valenti)*, 105 F.3d 55 (2d Cir.1997), the court held that bankruptcy courts may, in their discretion, assign value to collateral at the midpoint between replacement and foreclosure values, based on the facts and circumstances of the particular case. The Supreme Court granted certiorari in the Fifth Circuit decision to resolve this conflict among the Courts of Appeals. It then reversed the Court of Appeals decision, holding "that § 506(a) directs application of the replacement-value standard." *Rash*, —— U.S. at ——, 117 S.Ct. at 1882.[6]

*Rash* places much emphasis upon the second sentence in § 506(a), which requires that value be determined in light of the purpose of the valuation and the proposed disposition or use of the property. It concludes that applying a foreclosure-value standard in a cram down attributes no significance to the different consequences of the debtor's choice to surrender or retain the property, while a replacement-value standard distinguishes between the two and "renders meaningful the key words 'disposition or use.'" *Rash*, —— U.S. at ——, 117 S.Ct. at 1885.

Referring to what it characterizes as the "Seventh Circuit's split-the-difference approach" in *Hoskins*, the court states that "[w]hatever the attractiveness of a standard that picks the midpoint between foreclosure and replacement values, there is no warrant for it in the Code."[7] The court agrees that a simple rule of valuation is needed to serve the interests of predictability and uniformity, but nevertheless concludes that " § 506(a) supplies a governing instruction less complex than the Seventh Circuit's 'make two valuations, then split the difference' formulation" *Rash*, —— U.S. at ——, 117 S.Ct. at 1886.

The court also rejects "a ruleless approach allowing use of different valuation standards based on the facts and circumstances of individual cases," citing *Valenti*. *Id.*, n. 5.

The court states that "[B]y replacement value, we mean the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property or like age and condition." *Rash*, —— U.S. at ——, n. 2, 117 S.Ct. at 1884, n. 2. Later, it concludes as follows: "In sum, under § 506(a), the value of property retained because the debtor has exercised the § 1325(a)(5)(B) 'cram down' option is the cost the debtor would incur to obtain a like asset for the same 'proposed ... use.'" It is at this point that a final footnote is added, the effect of which is to provide more questions than answers.[8]

---

5. In fact, the *Hoskins* court established the average of retail and wholesale values, not foreclosure and replacement values, as the value of the secured interest in Chapter 13 cases involving automobiles and similar assets used to produce income for the debtor. *Hoskins*, 102 F.3d at 316.

6. In this order, citations and references to *"Rash"* will be to the Supreme Court case, unless otherwise specified.

7. *See* note 5, supra.

8. At —— U.S. at —————, n. 6, 117 S.Ct. at 1886–87, n. 6 is as follows: "Our recognition that the replacement-value standard, not the

## DISCUSSION AND ANALYSIS

It has been suggested that *Rash* does little to promote certainty or simplicity to the valuation process, that while the court had the opportunity to clarify and simplify the difficult valuation process, it opted to insert less certainty into the process, and that because of the case-by-case analysis and the subjective component to the analysis, uniformity is not furthered.[9]

After *Rash*, in a Chapter 13 cram down valuation, this court may not apply as a definitive determination of value the average of foreclosure value and replacement values, as the Supreme Court characterized the standard adopted by *Hoskins*. Neither may it apply the foreclosure value standard called for under the *en banc* decision of the Fifth Circuit, which was reversed by the Supreme Court in *Rash*. Finally, it may not exercise its discretion to determine valuation of collateral in these cases on a case-by-case basis, as *Valenti* would have permitted.[10]

Under the *Rash*, footnote 6, this court may identify, as trier of fact, the best way of ascertaining replacement value on the basis of the evidence presented, including whether replacement value is the equivalent of retail, wholesale, or some other value, depending on the type of debtor and the nature of the property. It appears to this court that it possesses a license under that footnote to determine valuation in a manner very close to that permitted under *Valenti*, and that the result in many instances may be virtually indistinguishable from that which would have been obtained under *Hoskins*, and under *Stauffer* and *Myers*.

This court notes that Justice Stevens, dissenting in *Rash*, points out that § 506(a) is a "utility" provision that operates in many different contexts in the Code. He continues: "Even if the words 'proposed disposition or use' did not gain special meaning in the cram down context, this would not render them surplusage because they have operational significance in their many other Code applications." *Rash*, ⸺ U.S. at ⸺, 117 S.Ct. at 1887 (Stevens, J., dissenting). This court expressed a similar view in *Myers*.[11]

This court has found only three post-*Rash* decisions which discuss in detail the proper application of the replacement-value standard: *In re Russell*, 211 B.R. 12 (Bankr. E.D.N.C.1997); *In re Franklin*, 213 B.R. 781 (Bankr.N.D.Fla.1997); *In re McElroy*, 210 B.R. 833 (Bankr.D.Or.1997).

*The Russell Case.*

In *Russell*, Judge A. Thomas Small discusses *Rash*, along with the contentions of the parties in the case before him. He rejects the suggestion that the *Rash* footnote 6

---

foreclosure-value standard, governs in cramdown cases leaves to bankruptcy courts, as triers of fact, identification of the best way of ascertaining replacement value on the basis of the evidence presented. Whether replacement value is the equivalent of retail value, wholesale value, or some other value will depend on the type of debtor and the nature of the property. We note, however, that replacement value, in this context, should not include certain items. For example, where the proper measure of the replacement value of a vehicle is its retail value, an adjustment to that value may be necessary: A creditor should not receive portions of the retail price, if any, that reflect the value of items the debtor does not receive when he retains his vehicle, items such as warranties, inventory storage, and reconditioning. Cf. 90 F.3d, at 1051–1052. Nor should the creditor gain from modifications to the property—*e.g.*, the addition of accessories to a vehicle—to which a creditor's lien would not extend under state law".

**9.** *See* Laurie B. Williams, *The Rash Decision: Is "Replacement Value" a Terminal Case of Poison*

*Ivy or a Mild Case of Eczema?*, Norton Bankruptcy Law Adviser (Issue No. 6, June, 1997, 9, 11).

**10.** The criticism of *Valenti* may be only to its perceived authorization for bankruptcy courts to apply different standards or methodologies in similar cases.

**11.** "This court is of the view that the importance of the second sentence of § 506(a) in the context of valuations of personal automobiles sought to be retained in Chapter 13 cases has been overemphasized by the courts which have addressed this issue. The only reason for a § 506(a) valuation of a personal automobile in a Chapter 13 case is to establish the amount of the creditor's secured claim in order to permit debtor to retain and use the property and provide for the secured claim in the Chapter 13 plan in accordance with § 1325(a)(5)(B). Otherwise, the debtor would simply surrender the property to the creditor, § 1325(a)(5)(C) would be satisfied, and any impediment to confirmation of the debtor's Chapter 13 plan created by the creditor's secured claim would be removed." *Myers*, 178 B.R. at 523.

requires that retailer overhead be deducted from NADA retail value, noting that that value does not include any extra value for items not retained by the debtor, such as warranty or reconditioning costs. Judge Small states that requiring a reduction of retail costs from NADA retail value would be inconsistent with the specific language of the Supreme Court in *Rash*. In conclusion, Judge Small states that the practice previously employed in his court with respect to automobiles has worked well and will be continued: His court will use replacement value, which in most cases will be retail value without reduction for retail costs, and the starting point for that valuation will be NADA retail value. *Russell,* 211 B.R. at 14.

*The Franklin Case.*

In *Franklin,* Bankruptcy Judge Lewis M. Killian, Jr. first notes that under previous decisions, valuation of automobiles in his court had as its starting point the average between retail and wholesale values, with adjustments upward or downward if called for by special circumstances. He notes that the Supreme Court in *Rash* rejected the approaches of both *Hoskins* and *Valenti,* but that those cases used retail and wholesale valuations, and that neither used the terms "foreclosure value" or "replacement value." He rejects the argument that replacement value and retail value are synonymous, relying upon the *Rash* note 6. Judge Killian continues as follows:

> In expressly recognizing that several components go into retail pricing that should not be included as a part of the replacement value of collateral, the Supreme Court has allowed bankruptcy courts to move the appropriate measure of replacement value back to some point between wholesale and retail values. Since the rule I announced in [In re] Rowland [166 B.R. 172 (Bankr.N.D.Fla.1994)] does not absolutely fix the value at the midpoint between retail and wholesale, but merely utilizes that as a starting point based on a recognition that such a value more closely

approximates a price available in an open market rather than purely a retail market, I do not believe that the decision in *Rash* dictates any change in methodology.

*Franklin,* 213 B.R. at 783.

Judge Killian then proceeds to establish the value of the vehicle in question, starting with the average of the retail and wholesale values from the then current NADA guide, and making adjustments required by the circumstances of the particular case. *Id.*

*The McElroy Case.*

In *McElroy,* Bankruptcy Judge Elizabeth L. Perris concludes that *Rash* and *Taffi* require the bankruptcy court to determine the appropriate valuation from actual sale prices in the market, and rejects a valuation technique which relies primarily upon advertised asking prices rather than actual sales prices. Judge Perris seems to consider the terms replacement value and fair market value to be synonymous.[12] In any event, Judge Perris, although making reference to The Kelley Auto Market Report Blue Book, a reference book similar to the NADA guides generally employed in this district, proceeded to determine the value of the vehicles in that case apparently without reference to that source, based upon the testimony of the experts who testified before her, with adjustments for the credibility of the witnesses.

The methodology employed by Judge Perris is comprehensive and its uniform application would undoubtedly result in fairly accurate valuation in conformity with the directive of *Rash.* Its dependence upon the availability of expert testimony and actual sales prices in every case, however, in this court's view, makes it impractical and virtually impossible to implement as a rule of broad, general application.

Almost 3,000 Chapter 13 cases were filed in this district and assigned to this court in 1997. The vast majority of those cases, and of the thousands of other active Chapter 13 cases, involve one or more vehicles.[13] In this

---

**12.** It is noted that the Ninth Circuit, in *Taffi,* distinguished replacement value and fair market value and treated them as separate and distinct standards, but that the Supreme Court in *Rash* found its use of the term replacement value to be

consistent with the Ninth Circuit's understanding of the meaning of the term fair market value.

**13.** *See also Russell, supra,* 211 B.R. at 14, n. 3.

court's experience, a significant motivation for seeking protection under Chapter 13 is the desire of debtor[s] to retain one or more personal automobiles, which otherwise would be foreclosed and lost unless the debtor[s] could redeem the vehicle under § 722 or the creditor was willing to accept reaffirmation by debtor[s]. Redemption, which requires payment of the fair market value of the property in a lump sum, is seldom a viable option. Further, in instances where reaffirmation might be an option, the creditor in most instances would require that debtor[s] reaffirm the entire outstanding indebtedness. Chapter 13 cram down, as noted herein, provides an option more favorable to debtor[s] than either redemption or reaffirmation.

In *Rash*, the vehicle involved was a Kenworth tractor truck used by debtor in his freight-hauling business, valued by debtor at $28,500 and by the secured creditor at $41,-171. In the cases before this court, most vehicles are personal automobiles, and the difference between the valuations sought by debtors and creditors is seldom more than $3,000, and is frequently less than that amount. As a result, litigation of the valuation dispute is not economically justifiable in most cases, and the issue is resolved through negotiation between the parties.[14]

Resolution of these issues prior to *Rash* was made possible in most cases with the expenditure of little or no time and expense, by application of this court's *Myers* decision, which mandated as a starting point the average of the wholesale (trade-in) and the retail values from the NADA or other reliable guide, and permitted either party to obtain a hearing and present evidence in support of a greater or lesser value based upon the particular circumstances of the case.

While *Rash* requires that the value to be employed in Chapter 13 cram downs is replacement value, it leaves to the bankruptcy courts, as triers of fact, identification of the best way to ascertain that value. In this court's view, the volume of cases in which the issue exists in this district cries out for the establishment of a starting point for such determination. With knowledge of the point at which this court will begin its valuation inquiry in the event of litigation, debtors will be in a position to propose, and creditors to agree upon, valuations acceptable to the court. Other issues affecting value in particular cases may be resolved between the parties, without the expenditure of time, money and judicial resources which litigation of the issue in each case would entail. Similarly, even when the issue is required to be litigated, the existence of such a starting point will substantially reduce the time and effort required in preparation for and at trial.

This court believes the NADA guides constitute valid, objective, and authoritative sources from which average retail and wholesale values may be obtained for most automobiles and other vehicles sought to be retained by Chapter 13 debtors. While these values do not purport to constitute definitive appraisals of particular vehicles, they present compilations of average prices for vehicles of like age, model, style and condition, with adjustments to be made for accessories, optional equipment, high mileage and other variables. This court, therefore, will accept into evidence at vehicle valuation hearings, NADA and other comparable, reliable sources or appropriate compilations or excerpts therefrom.[15]

At the hearing in this case, AMN introduced an excerpt from the NADA Official Used Car Guide, showing values, adjusted

14. In this district, any valuation dispute must be resolved prior to the hearing on confirmation of the proposed Chapter 13 plan, and it is incumbent upon the party objecting to the valuation proposed in the plan to obtain a hearing for that purpose if the issue can not be otherwise resolved. Thus, creditors regularly obtain settings for that purpose. The court is rarely required to actually conduct such hearings, however, the issue having been settled prior to hearing.

15. Admission of such evidence is appropriate pursuant to Rule 803, Federal Rules of Evidence, which is in material part as follows:
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
***
(17) Market reports, commercial publications. Market quotations, tabulations, lists, directories, or other published compilations, generally used and relied upon by the public or by persons in particular occupations.

upward for accessories and optional equipment and downward for high mileage, of $14,475 retail and $12,300 trade-in. AMN's witness, an employee of a local new and used car dealer and a registered automotive auction buyer, testified that he had not inspected the vehicle in question. He also testified that a like vehicle should sell at the wholesale automotive auction for between $11,000 and $11,500, and that dealers were asking $15,900 for similar vehicles on their lots. He also testified that in order to sell a used vehicle at retail, the dealer would expend an average of $300 in reconditioning or "detailing" the vehicle.

Debtor's witness, an employee of an insurance adjustment company, testified that he had personally examined and inspected debtor's vehicle shortly before the hearing. His written appraisal states that the vehicle was evaluated "at $10,136 ready to sell." Debtor's exhibit "A." It is also stated that if disclosure was made of collision damage repairs prior to sale, the vehicle would be worth considerably less, between $9,000 and $9,500. He testified that the substantial amounts were expended to repair collision damage to the vehicle, and that in his opinion, the vehicle probably should have been "totalled" by the adjuster who authorized the repairs. Using newspaper advertisement asking prices of comparable vehicles by two individuals and an automobile dealer, adjusted downward for model and equipment differences in the advertised vehicles, and for needed repairs, detailing and high mileage on the subject vehicle, the appraisal concluded that the actual value of the subject vehicle was $9,870.

■ Contrary to the assumption made by Judge Small in *Russell,* it appears clear to this court that the average retail prices compiled by NADA do in fact include at least two of the items which *Rash* specifically stated should not be included in determining replacement value; inventory storage and reconditioning. Those items are part of a dealer's overhead which is necessary in order to maintain a retail sales facility, and are obviously taken into account in the determination of what a vehicle must be sold for in order to return a profit. Those items, therefore, necessarily must be included in the prices for which automobiles are ultimately sold by automobile dealers, which prices make up the compilations in the NADA guides. *Rash* thus mandates that retail value, as represented by the NADA guide, be adjusted downward in some amount in order to remove those items.

In *Rash,* the Supreme Court made it clear that the foreclosure-value standard adopted by the Court of Appeals was not the appropriate standard, reversing that decision and mandating a replacement value standard. By stating in footnote 6 that the bankruptcy courts would have to determine whether replacement value is the equivalent of retail value, wholesale value, or some other value depending on the type of debtor and the nature of the property, the Court made it clear that foreclosure value was not necessarily the equivalent of wholesale value, and that in a proper case, either NADA wholesale (trade-in) or retail value, or some other amount, could be found to constitute replacement value.

■ The case before this court involves a personal vehicle sought to be retained by debtor for personal use. It is not a commercial vehicle proposed to be used in a trade or business to generate income, as was the case in *Rash.* This does not make the vehicle of any less importance to debtor, who may very well have no other means of transportation to and from employment and for other necessary purposes. It does, however, indicate that debtor would not be able to replace the vehicle in the wholesale market, absent evidence to the contrary. That assumption, coupled with the determination above, that replacement value is in almost all instances going to be something less than retail value, leads to the conclusion that replacement value as described in *Rash,* in these circumstances, is in virtually every case going to be some value between NADA wholesale and retail.

For the reasons set out above, this court does not believe that arbitrarily fixing the average of the retail and wholesale NADA guide values as the starting point for valuation in cases involving automobiles and other vehicles sought to be retained by Chapter 13

debtors would violate the dictates of *Rash*. Under *Rash*, replacement value may be the equivalent of retail, wholesale, or some other value, and, as is noted above, this court has concluded that the proper application of *Rash* in cases involving retained automobiles and other vehicles will result in valuation in an amount less than the retail and more than the wholesale values found in the appropriate NADA or equivalent guide. The average of those values, therefore, should be established, as a guide to debtors, creditors and their counsel, as the starting point for valuation in those cases, in the event of litigation. Other admissible evidence, in support of a higher or lower valuation, will be received at any hearing held pursuant to the objection of any party in interest. Obviously, it is anticipated that hearings for the purpose of valuation will be required only when one party or the other is prepared to offer evidence in support of a higher or lower value. The amount ascertained as the starting point will be established as the value of the property for purposes of § 506(a) only in the absence of other evidence. The starting point will be the value ultimately determined by the court to be the value of the allowed secured claim only when neither party presents any credible evidence in support of another value, higher or lower, or when the weight of conflicting evidence is found to be exactly equal. Obviously, neither of these results will be obtained with any frequency, if ever. If the parties are that close together in their beliefs with regard to the value of the automobile, bringing the issue before the court would be counter-productive, and an unwarranted waste of time, money, and judicial resources.

### DECISION

■ Applying this standard to the case before the court, the average of the $14,475 retail and $12,300 wholesale values from the NADA guide is $13,387. AMN's witness relied primarily upon the NADA retail value, his knowledge of automotive auctions and asking prices on the lot of his employer. He conceded that he had not inspected the vehicle itself. No reason was given for not having examined the vehicle. Debtor's witness had inspected the vehicle shortly before the hearing and provided a written appraisal. He testified to substantial damage to the vehicle which had been repaired, and that disclosure of such damage and repair would significantly reduce the value of the vehicle. The appraisal of this witness was based upon newspaper asking prices, adjusted for model and equipment variations. It was further adjusted for needed repairs, detailing, parts and high mileage.

■ The value of the testimony of AMN's witness is adversely affected by the fact that he had not actually seen the vehicle. The value of the testimony of debtor's witness is adversely affected by his use of only advertised asking prices as a basis for valuation. The uncontroverted testimony concerning substantial previous damage to the vehicle, however, clearly justifies a downward adjustment to its value.

The court begins with the $13,387 average of the retail and wholesale prices for a like vehicle from the NADA guide, appropriately adjusted for equipment and mileage. It then must make a downward adjustment for the substantial damage to the vehicle, albeit repaired, and for needed further repairs prior to marketing. Applying these adjustments, and considering the credibility of the witnesses who testified at the hearing, the court finds and concludes the value of the vehicle in this case to be $12,200.

IT IS SO ORDERED.