**In re Louis Shelton OGLESBY, Jr., SSN: 312–62–5924, Pamela Jean Oglesby, SSN: 522–98–1267, Debtors.**

**Michael Anthony JONES, SSN: 098–68–6830, Nicole Angela Jones, f/k/a Nicole Angela Washington, SSN: 071–70–7664, Debtors.**

**Bankruptcy Nos. 97–27482SBB, 97–27788SBB.**

United States Bankruptcy Court, D. Colorado.

June 12, 1998.

L.B. Schwartz, Englewood, CO, for Debtors.

Rosanne Hall, Hall Law Firm, P.C., Denver, CO, for Community Credit Co.

James B. Boisclair, Boisclair and Taylor, Denver, CO, for Fidelity Financial Services, Inc.

## MEMORANDUM OPINION AND ORDER

SIDNEY B. BROOKS, Bankruptcy Judge.

THIS MATTER came before the Court for hearing on April 15, 1998, on (1) Community Credit Company's ("Community") Objection to Confirmation of the Chapter 13 Plan of Debtors Louis and Pamela Oglesby, and (2) Fidelity Financial Services, Inc.'s ("Fidelity") Objection to Confirmation of the Chapter 13 Plan of Debtors Michael and Nicole Jones. The Court, having reviewed the files and being advised in the premises, issues the following findings of fact, conclusions of law, and Orders.

### I. *ISSUES*

These Chapter 13 bankruptcy cases and the objections to confirmation of their re-

spective plans, require the Court to determine (1) the appropriate valuation of the collateral for "cram down" purposes in a case in which a Chapter 13 debtor proposes to retain an automobile for personal use, and (2) the appropriate interest rate or capitalization rate to be applied to the allowed secured claim of a creditor under 11 U.S.C. § 1325(a)(5)(B)(ii) for purposes of fixing "present value." As discussed below, these two cases illustrate the continuing confusion in interpreting and applying applicable case law (*Associates Commercial Corp. v. Rash*, —— U.S. ——, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997)), and the persistent problems in establishing appropriate capitalization rates for fixing present value in "cram down" situations.

## II. *FACTUAL BACKGROUND*

### 1. *In re Louis and Pamela Oglesby*, Case No. 97–27482SBB

Louis and Pamela Oglesby filed a Voluntary Petition under Chapter 13 of the Bankruptcy Code on November 24, 1997. Debtors' Schedules include a claim by Community in the amount of $8,054.65, secured by a 1993 Chevrolet Lumina valued by Debtors at $7,700.00. Debtors' Chapter 13 Plan proposes to reduce the secured claim of Community from $8,054.65 to $7,700.00, and to provide a 9% interest or capitalization rate. Community objected to confirmation of the Plan on two grounds. First, Community contends that Debtors have undervalued the automobile. Community asserts that the proper value of the automobile is the replacement value, which Community equates with retail value. Second, Community maintains that a 9% interest or capitalization rate is inadequate to provide Community with an amount equal to the present value of its claim as required by 11 U.S.C. § 1325(a)(5). Community contends that the appropriate capitalization rate should be based on Community's current average rate of interest for similar loans in the region, which, according to the testimony at the hearing, would be 20.19%.

### 2. *In re Michael and Nicole Jones*, Case No. 97–27788SBB

Michael and Nicole Jones filed a Voluntary Petition under Chapter 13 of the Bankruptcy Code on December 2, 1997. Debtors' Schedules include a claim by Fidelity secured by a 1994 Toyota Corolla. Although Fidelity initially objected to the Debtor's valuation of the automobile, the parties resolved this objection prior to hearing by way of stipulation. The stipulated value of the automobile is less than the claim amount and Debtors propose to reduce the claim of Fidelity to the stipulated value and to provide 9% interest or capitalization on that claim. Fidelity maintains that a 9% capitalization or interest rate is inadequate to provide Fidelity with an amount equal to the present value of its claim as required by 11 U.S.C. § 1325(a)(5). Like Community, Fidelity contends that the appropriate capitalization rate should be based on Fidelity's current average rate of interest for similar loans in the region, which, according to the testimony presented at the hearing, would be 21%.

## III. DISCUSSION

### 1. Valuation

The first issue, pertaining only to the Oglesby case, requires this Court to determine how the valuation standard set forth by the Supreme Court in *Associates Commercial Corp. v. Rash*, —— U.S. ——, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997) should be applied. In *Rash*, the Supreme Court held that 11 U.S.C. § 506(a) requires bankruptcy courts to use the replacement-value standard to determine the value of property that a chapter 13 debtor elects to retain and use under 11 U.S.C. § 1325(a)(5)(B). *Id.* at ——, 117 S.Ct. at 1883. The Court explained that

> [B]y replacement value, we mean the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition.

*Id.* at ——, n. 2, 117 S.Ct. at 1884, n. 2.

The *Rash* Court noted that there is a *need for a simple rule of valuation* in this context. The Court, however, by adding footnote six, made the valuation question more difficult. In footnote six, the Court stated:

Our recognition that the replacement-value standard, not the foreclosure-value standard, governs in cram down cases leaves to bankruptcy courts, as triers of fact, identification of the best way of ascertaining replacement value on the basis of the evidence presented. Whether replacement value is the equivalent of retail value, wholesale value, or some other value will depend on the type of debtor and the nature of the property. We note, however, that replacement value, in this context, should not include certain items. For example, where the proper measure of the replacement value of a vehicle is its retail value, an adjustment to that value may be necessary: A creditor should not receive portions of the retail price, if any, that reflect the value of items the debtor does not receive when he retains his vehicle, items such as warranties, inventory storage, and reconditioning. Cf. 90 F.3d, at 1051–1052. Nor should the creditor gain from modifications to the property—e.g., the addition of accessories to a vehicle—to which a creditor's lien would not extend under state law.

*Id.* at ——, 117 S.Ct. at 1886.

The Oglesby case is a good example of the diverse positions parties assert while using the same *Rash* replacement-valuation standard. Community asserts that under *Rash*, the appropriate valuation standard in a Chapter 13 cram down situation is the retail value. Debtors, on the other hand, contend that *Rash* dictates a valuation standard somewhere between wholesale and retail value.

Other courts that have attempted to apply the *Rash* valuation standard have also reached disparate results. In *In re Younger*, 216 B.R. 649 (Bankr.W.D.Okla.1998), the court determined that the average retail price in the National Automobile Dealers Association ("NADA") guides [1] includes at least two items that the *Rash* Court specifically stated should not be included in determining replacement value: storage and recondition-

ing. *Id.* at 656. Accordingly, the court determined that under *Rash*, a court must look to the proposed use of the vehicle to determine the proper valuation. *Id.* If the vehicle is to be retained for personal use, then, absent evidence to the contrary, the wholesale market would not be available to the debtor to replace the vehicle. The inability to replace the vehicle in the wholesale market, coupled with the necessary deductions from the retail value, led the court to conclude that

> [T]he proper application of *Rash* in cases involving retained automobiles and other vehicles will result in valuation in an amount less than the retail and more than the wholesale values found in the appropriate NADA or equivalent guide. The average of those values, therefore, should be established, as a guide to debtors, creditors and their counsel, as the starting point for valuation in those cases, in the event of litigation. Other admissible evidence, in support of a higher or lower valuation, will be received at any hearing held pursuant to the objection of any party in interest. *Id.* at 657.

As in *Younger*, the court in *In re Franklin*, 213 B.R. 781 (Bankr.N.D.Fla.1997) rejected the argument that replacement value and retail value are synonymous. *Id.* at 783. The court found that several components go into retail pricing which should not be included as part of the replacement value of collateral. Therefore, the court surmised that the correct starting point is somewhere between wholesale and retail values. *Id.* at 783. The *Franklin* court concluded that it intended to continue its long-standing practice of using the halfway point between wholesale and retail as the starting point for valuation. *Id.* at 783.

In contrast to *Franklin* and *Younger*, the court in *In re Russell*, 211 B.R. 12 (Bankr. E.D.N.C.1997) held that "replacement" value would mean, in most cases, the retail value with no reduction for items such as warranty or reconditioning costs. *Id.* at 13. The *Rus-*

---

**1.** The *Younger* court noted that the "NADA guides constitute valid, objective, and authoritative sources from which average retail and wholesale values may be obtained for most auto-

mobiles and other vehicles sought to be retained by Chapter 13 debtors." *Younger*, 216 B.R. at 655.

*sell* court concluded that the starting point for valuation in that court would be the NADA retail value. *Id.* at 14.

The final post-*Rash* case located and reviewed by this Court is, unfortunately, of limited value. In *In re McElroy*, 210 B.R. 833 (Bankr.D.Or.1997), the court based its valuation decision on the actual sale prices in the market by relying solely on the testimony of experts to determine the value. Although such an approach may be accurate and comply with the holding of *Rash*, it is not especially helpful in developing a standard valuation approach which will help promote a measure of certainty, continuity and simplicity in the valuation process.

This Court finds the decisions in *Younger* and *Franklin* to be persuasive and well-reasoned. From a reading of footnote six of the *Rash* decision, it appears clear that the Supreme Court did not equate replacement value with retail value. Nor did the Supreme Court endorse a wholesale or foreclosure value. Instead, the Court stated that the value will depend on the type of debt, the nature of the property and the market. The Supreme Court left it to the bankruptcy courts to determine, on a case-by-case basis, the best way of determining replacement value depending on the evidence presented. However, due to the volume of chapter 13 cases, a case-by-case analysis or determination of value is impractical. To promote a measure of certainty, continuity and simplicity in the valuation process for both debtors and creditors, this Court believes a general rule—or recognized standard—for establishing replacement value, or at least a *starting point* for fixing an accurate and reasonable replacement value, is appropriate.[2]

■ In general, in Chapter 13 cases where the debtor proposes to retain a vehicle for personal use, the starting point for valuation of that vehicle will not be retail value. Since *Rash* dictates that the replacement value of the vehicle does not include items such as warranties, inventory storage and reconditioning, a downward adjustment must be made to the retail value contained in the NADA guides.[3] Neither would the wholesale value be appropriate, because most, if not all, debtors have no ability to replace the vehicle in the wholesale market. Therefore, in order to facilitate a more predictable, somewhat simplified, less litigious valuation process, where value of a debtor's automobile is disputed, a starting point for valuation in a Chapter 13 cram down in this Court will be the midpoint between retail and wholesale, as may be established by agreement between the parties, or by the most current applicable NADA guide. That value will be subject to, and may be modified by, such evidence as either party may present at a hearing.

■ Applying such an approach in the Oglesby case results in a starting point valuation of $8,050.00. The only evidence presented by the parties was that the retail value of the 1993 Chevrolet in question, according to the NADA guides, is $8,400.00 and the wholesale value is $7,700.00. The average of those two values is $8,050.00. Since neither party offered any additional admissible evidence in support of a higher or lower value, the $8,050.00 value would be the appropriate value to use in this case.

In the absence of any admissible, credible evidence as to the actual value or condition of the collateral, the Court is left only with the agreed upon, or stipulated, source of recognized value. In Oglesby, the parties agreed on the NADA guides as the proper source for obtaining values and no other admissible, credible evidence was presented to the Court regarding the value of the collateral.

## 2. Capitalization Rate

The common issue in these two Chapter 13 cases is the appropriate capitalization or interest rate which will assure that a secured creditor receives compensation equal to the

---

2. This general rule—or recognized standard—is in lieu of a stipulation between the parties as to value of the debtor's vehicle which is, always, preferable.

3. This Court agrees with the *Younger* court, that in the absence of other admissible, credible evidence, as submitted by the parties, the NADA guides provide a valid, objective, and authoritative source from which average retail and wholesale values can be obtained for most automobiles in a Chapter 13 case.

present value of its claim as required by 11 U.S.C. 1325(a)(5)(B)(ii).[4] In this District, any analysis of this issue necessarily begins with the Tenth Circuit opinion *In re Hardzog,* 901 F.2d 858 (10th Cir.1990). In *Hardzog,* the Tenth Circuit was called upon to interpret 11 U.S.C. § 1225(a)(5)(B)(ii), which contains basically identical language as that found in 11 U.S.C. § 1325(a)(5)(B)(ii). In interpreting Section 1225(a)(5)(B)(ii), the Tenth Circuit held that

> [I]n the absence of special circumstances, such as the market rate being higher than the contract rate, Bankruptcy Courts should use the *current market rate of interest used for similar loans in the region. Id.* at 860 [footnote omitted] [emphasis added].[5]

The Tenth Circuit noted that the current interest rates on like-type loans should be easily susceptible of determination by means of a hearing where each party is given the opportunity to submit evidence concerning the current market rate of interest for *similar loans in the region. Id.*

The dispute in the within cases arises over the correct interpretation of the "current market rate of interest" and "similar" or "like-type" loans, as those terms are used in the *Hardzog* case. Debtors in both Oglesby and Jones argue that the "current market rate of interest" should be some variation on the "prime lending rate" or "prevailing market rate" as reflected in, for example, the *Wall Street Journal.* Debtors assert that this is the only method which will fairly compensate or make a creditor whole, but will not provide a creditor with "unlawful" profits. Debtors' Briefs, p. 2. Debtors contend that creditors are not entitled to make a profit from debtors in a cram down situation. Debtors also maintain that "similar" or "like-type" loans must take into account the broad spectrum of loans available to consumers, i.e. the Court must include rates being charged

by banks, credit unions, and other financial institutions, and not just rates charged by the particular creditor objecting to confirmation.

■ In support of their position, Debtors point to three decisions from other courts. First, Debtors cite *In re Jordan,* 130 B.R. 185 (Bankr.D.C.N.J.1991) where the court adopted a present worth or stream of payments approach based on the prime rate as reflected in the *Wall Street Journal.* Next, Debtors rely on *In re Ivey,* 147 B.R. 109 (M.D.N.C.1992) where the court used the yield on a treasury bond of the same maturity term as the length of the plan, plus one or two percent upward adjustment for risk of default under the plan. Such approaches, often referred to as the "cost of funds" approach, have been highly and extensively criticized by other courts that have addressed the issue. See, e.g., *General Motors Acceptance Corporation v. Jones,* 999 F.2d 63, 67 (3rd Cir.1993); *United Carolina Bank v. Hall,* 993 F.2d 1126, 1130 (4th Cir.1993); *In re Galvao,* 183 B.R. 23, 25 (Bankr.D.Mass. 1995). This Court agrees that the "cost of funds" approach is problematic and, more importantly, fails to implement the holding of the Tenth Circuit in *Hardzog.* The Tenth Circuit ruled that the current market rate of interest depends on the rate of interest used for "similar" loans in the "region." *Hardzog,* 901 at 860. If the "cost of funds" approach is used, there would be no need to consider the rates being charged for "similar" loans; the only relevant rate would be the prime rate as reflected in the *Wall Street Journal* or the current yield on a treasury bond. Additionally, since these are national rates, there would be no need to consider the region in which the loan is made. Such an approach is clearly contrary to the holding in *Hardzog.*

Finally, Debtors point to *In re Wilmsmeyer,* 171 B.R. 61 (Bankr.E.D.Mo.1994) to sup-

---

4. 1325(a)(5)(B)(ii) provides that a Chapter 13 plan may be confirmed if, with respect to each allowed secured claim provided for by the plan, the holder of such claim receives "the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim [of] not less than the allowed amount of such claim . . . . "

5. By implication, the language used by the Tenth Circuit Court in *Hardzog* suggests that *if* the prevailing market rate *is* higher than the contract rate, then the market rate should *not* be used. Rather, the contract rate should be used; it serves as a sort of ceiling for the capitalization rate in a cram down situation.

port their position. There, the court established a 9½% capitalization rate by local rule. The local rule was adopted for administrative, judicial and economic convenience. *Id.* at 63. Since this District does not have a local rule affecting capitalization rates and this Court is unaware of any plans to adopt such a rule in the future, this case is of limited precedential value.

In contrast to the cases cited above and to Debtors' arguments, both Community and Fidelity argue that the correct interpretation of "current market rate of interest," as it is used in *Hardzog,* means the rate charged by the particular or objecting creditor for similar loans in the region in the recent past. Both creditors assert that the current market rate can only be measured from the creditor's perspective. That is, if it had the cash, what rate would this creditor have been able to realize in the market that existed at the time the bankruptcy was filed. Additionally, Community and Fidelity both assert that "similar" or "like-type" loan means a loan that the creditor regularly extends to other borrowers who are not in bankruptcy but who are otherwise similarly situated to the debtor. Community and Fidelity both presented evidence that they routinely and uniformly make automobile loans to high risk borrowers, i.e. persons with poor credit histories and/or borrowers who cannot, typically, obtain loans at conventional or more customary market rates. Thus, Community and Fidelity argue, their "market rate" reflects a high risk market, high risk borrowers, and, thus, a high risk interest or capitalization rate, and they should not be arbitrarily and routinely relegated in bankruptcy cases to making "regular" market rate loans.

In a previous decision of this Court, the capitalization questions raised by the parties were addressed and answered, at least in part. In applying the principles and following the express holding in *Hardzog,* this Court, in *In re Mellema,* 124 B.R. 103 (Bankr.D.Colo.1991), held that

> The prevailing market rate of interest used for similar loans in the region must, generally, be applied in Chapter 13 cases where the debtor seeks to write-down—or cramdown—an undersecured creditor's claim. The prevailing market rate of interest for similar loans in the region is best exemplified by GMAC's loans recently made in the marketplace in this region.

*Id.* at 107.

Accordingly, it appears this Court has already adopted a rule which would dictate that the creditors' arguments in the within cases are the correct interpretation and application of the *Hardzog* holding. This Court is aware, however, that creditors and debtors in this District have not been applying such an interpretation of *Hardzog* or *Mellema.* In fact, as evidenced by the testimony of Wendy Wagner, Staff Attorney for the Chapter 13 Trustee for the District of Colorado, the typical or average capitalization rates in Chapter 13 cases in this District range from 9% to 12%. Ms. Wagner testified that as few as 5% of Chapter 13 cases in this District use a capitalization rate of 21%. Due to this discrepancy between current case law and the reality of what is occurring in practice, this Court will revisit the issue and review recent case law in the area.

Since the *Hardzog* and *Mellema* decisions, several circuit courts have addressed the capitalization rate issue. One of the more informative, well-reasoned and persuasive cases on this issue is *GMAC v. Jones,* 999 F.2d 63 (3rd Cir.1993). As with the Tenth Circuit in *Hardzog,* the Third Circuit adopted a "coerced loan" [6] approach, as opposed to a "cost of funds" approach, in determining interest rates in Chapter 13 bankruptcy cases. The *Jones* court maintained that

> It is only by acknowledging the coerced loan aspects of a cramdown and by compensating the secured creditor at the rate it would voluntarily accept for a loan of similar character, [FN4] amount and duration that the creditor can be placed in the collateral rather than repossess it, and the creditor is entitled to interest on his loan." *Memphis Bank & Trust Co. v. Whitman,* 692 F.2d 427, 429 (6th Cir.1982).

6. As defined succinctly by the Sixth Circuit, the basic idea of the "coerced loan" theory is that "[i]n effect the law requires the creditor to make a new loan in the amount of the value of the

same position he would have been in but for the cramdown.

> FN4. By a loan of "similar character" we mean a loan that the creditor regularly extends to other debtors who are not in bankruptcy but who are otherwise similarly situated to the debtor who is the recipient of the loan coerced by the chapter 13 proceeding and who are seeking the same kind of credit (e.g., auto loan, home equity loan, etc.)

*Id.* at 67.

The *Jones* court reaches this conclusion by analyzing Section 1325(a)(5)(B)(ii) in the same manner as it was later analyzed by the Supreme Court in the *Rash* decision. Both Courts determined that Section 1325(a)(5)(B)(ii) requires that the debtor provide the secured creditor with payments through the plan which equal the present value of the allowed secured claim. *Rash,* —— U.S. at ——, 117 S.Ct. at 1882–83; *Jones,* 999 F.2d at 69. Such an approach will put the creditor in the same position it would have been in if it had been allowed to end the lending relationship at the point of the bankruptcy filing by repossessing the collateral. *Jones,* 999 F.2d at 69. The Third Circuit admits that this approach will include a "profit" for the creditor, but the lending relationship between the debtor and the creditor always included a mutual anticipation of profit and, the court said, the bankruptcy filing should not eliminate that expectation. *Id.* at 69. The Third Circuit concluded that, in the absence of a stipulation regarding the creditor's current rate for a loan of similar character, amount, and duration, it would be appropriate for bankruptcy courts to accept a plan utilizing the contract rate if the creditor fails to come forward with persuasive evidence that its current rate is in excess of the contract rate. Conversely, if a debtor proposes a plan with a rate less than the contract rate, it would be appropriate, in the absence of a stipulation, for a bankruptcy court to require the debtor to come forward with some evidence that the creditor's current rate is less than the contract rate. *Id.* at 70–71.

An approach identical to the Third Circuit in *Jones* was adopted by the Fifth Circuit in *Matter of Smithwick,* 121 F.3d 211 (5th Cir. 1997). Additionally, the Fifth Circuit in *Smithwick* adopted the *Jones'* rebuttable presumption that the contract rate is the appropriate cram down interest rate in Chapter 13 cases. *Id.* at 215.

Similar approaches have also been adopted by the Fourth and Seventh Circuits. In *United Carolina Bank v. Hall,* 993 F.2d 1126 (4th Cir.1993), the Fourth Circuit held that the particular secured creditor's rate of return in its lending market was the appropriate rate for the new "coerced" Chapter 13 loan. The Seventh Circuit in *Koopmans v. Farm Credit Services of Mid–America, ACA,* 102 F.3d 874, 875 (7th Cir.1996) held, in a Chapter 12 case, that the creditor was entitled to the rate of interest it could have obtained had it foreclosed and reinvested the proceeds in loans of equivalent duration and risk.

After thoroughly reviewing the circuit court case law in this area, one commentator has suggested that

> [B]ankruptcy courts should endeavor to leave the secured creditor as well off as if it had been paid the amount of its secured claim in cash. The cram down interest rate should reflect what the secured creditor would have earned had it taken that cash and reinvested it in loans with terms comparable to the terms proposed by the debtor's plan and with risks comparable to the risks presented by the debtor's non-payment.

David G. Epstein, *Don't Go and Do Something Rash About Cram Down Interest Rates,* 49 Ala.L.Rev. 435, 468 (1998).

In implementing this recommended approach for leaving the secured creditor as well off as if it had been paid the amount of its secured claim in cash on the effective date of the plan, Epstein believes there are three options available to bankruptcy courts:

> In most cases, there will be evidence of *relatively comparable* transactions. In other cases, the plan's extreme terms or the debtor's extreme credit history will require that the bankruptcy court derive an interest rate from a combination of some base rate and an additional risk factor. And, in still other cases, bankruptcy courts may conclude that the rate in the

contract is the most credible evidence of what the secured creditor would have earned had it been paid a cash amount equal to the value of its secured claim and reinvested that cash in a loan comparable to the terms and risks presented by the debtor's plan.

Epstein, *supra*, at 468.

This Court agrees with the reasoning and conclusions reached by Epstein. However, it does not believe that the second option—base rate and an additional factor—espoused by Epstein is as sound, reliable, and "true" as are the other two options, nor does this Court believe that the second option effectively implements the "market rate of interest in the region" standard as dictated by the Tenth Circuit in *Hardzog*.

Accordingly, this Court concludes that the more reasoned approaches for determining capitalization rates, in Chapter 13 cases where the capitalization rate is disputed, are those set forth by the circuit court opinions referenced above, by the Tenth Circuit in *Hardzog*, and by this Court in *Mellema*. The cases advanced by Debtors do not comport with the holding of the Tenth Circuit in *Hardzog* and must be rejected.

■ This Court is bound by the precedent established in *Hardzog* to accept the "coerced loan" approach. Implementation of the "coerced loan" approach is best achieved by viewing the "market rate of interest" mandated by *Hardzog*, as the market rate for *similar* loans in the region which, at least as a benchmark, will be best exemplified by a particular creditor's actual loans recently made in the marketplace in this region. *Mellema*, 124 B.R. at 107. A particular creditor's loan rate can be established by (a) credible evidence of that creditor's recent comparable transactions conducted in the region or (b) the contract rate as modified by credible evidence relative to market conditions at the time of confirmation. These options will serve to put the secured creditor in a comparable position to what it would have been in but for the cram down, i.e. the secured creditor should be compensated at the rate it would voluntarily accept for "similar loans in the region." That said, any evidence produced by a debtor can serve to

reduce, or otherwise modify, the capitalization rate. The debtor, in carrying its burden under § 1325(a)(5), may produce any available relevant evidence as to "market rate of interest for similar loans in the region."

■ As applied to the cases at bar, the appropriate interest rate under Section 1325(a)(5)(B)(ii) is the interest rate charged by Community and Fidelity in this region, on the effective date of each plan, for a loan of similar character, amount and duration. The evidence presented at the hearing as to the actual, average interest rates charged by these particular creditors over the past three or four months is the most persuasive evidence available and will be applied to these cases. The Debtors offered no evidence to rebut or modify the creditors' evidence regarding similar loans in the region.

## IV. *CONCLUSION*

For the reasons set forth above, this Court believes that, absent a stipulated value between the parties, a correct starting point for valuation in a Chapter 13 cram down situation is the midpoint between retail and wholesale, recognizing that either party may obtain a hearing and present evidence in support of a higher or lower value based on the particular facts of the case. This holding provides a logical implementation of the *Rash* Court's mandate that bankruptcy courts determine the replacement value based on the evidence presented, while still promoting some certainty, uniformity, and simplicity in the valuation process for debtors and creditors alike.

In determining the proper capitalization or interest rate in a Chapter 13 cram down situation, Section 1325(a)(5)(B)(ii) requires that the debtor provide, in deferred payments through the plan, an amount sufficient to put the creditor in the same position it would have been in if it had been allowed to end the lending relationship at the point of the bankruptcy filing by repossessing the collateral or if the creditor had been paid the amount of its secured claim in cash on the effective date of the plan. This requires bankruptcy courts to ascertain the current market rate of interest that will effectively

allow the creditor to receive as much as it would have, but for the cram down. The Tenth Circuit requires that the current market rate reflect the rates used in similar loans in the region. This Court will equate "similar" loan with a loan that the creditor regularly extends to other borrowers who are not in bankruptcy but who are otherwise similarly situated to the debtor. This Court believes that this will be best exemplified by the actual, average rate charged by a particular creditor on loans it has recently and routinely extended to similarly situated borrowers in comparable transactions in this region. Alternatively, the Court will look to the contract rate, as modified by credible evidence relative to market conditions, at the time of confirmation.

### V. ORDER

Accordingly, it is

ORDERED that the proper valuation for the 1993 Chevrolet securing the claim of Community in the Oglesby case shall be $8,050.00, representing the average between the NADA retail and wholesale value.

IT IS FURTHER ORDERED that the appropriate capitalization rate for the claim of Community in the Oglesby case shall be 20.1% and the appropriate capitalization rate for the claim of Fidelity in the Jones case shall be 21%.