**In re Stephen Duane McELROY, Dixie Kay McElroy, Debtors.**

**Bankruptcy No. 397–30230–elp13.**

United States Bankruptcy Court,
D. Oregon.

June 30, 1997.

Magar E. Magar, Portland, OR, for debtors.

Thomas K. Hooper, Portland, OR, for Ford Motor Credit Co.

## MEMORANDUM OPINION

ELIZABETH L. PERRIS, Bankruptcy Judge.

Ford Motor Credit Company ("FMCC") objects to confirmation of the Chapter 13 plan proposed by Stephen and Dixie McElroy on the basis that the McElroys' value of their two vehicles is too low, the plan is not feasible and it does not meet the good faith requirement.

### FACTS

The McElroys filed Chapter 13 on September 23, 1996. The court dismissed the 1996 case on January 9, 1997 because debtors missed a plan payment. Mr. McElroy testified that they missed the plan payment because they had to pay unanticipated utility deposits. On January 13, 1997 the McElroys filed this Chapter 13 case.

### ISSUES

1. What is the value of debtors' two vehicles?

2. Does debtors' filing of two Chapter 13 cases within a short time period preclude a finding that they proposed their plan in good faith?

3. Is debtors' plan feasible?

### DISCUSSION

### I. VALUATION

The McElroys own two vehicles, a 1987 Ford F–250 diesel truck and a 1987 Chevrolet Celebrity. FMCC has a security interest in both vehicles. The parties focused much of their evidence and argument on how to value the vehicles in light of the recent decision by the Ninth Circuit Court of Appeals in *In re Taffi*, 96 F.3d 1190 (9th Cir.1996) (*en banc*), *cert. denied* —— U.S. ——, 117 S.Ct. 2478, 138 L.Ed.2d 987 (1997). *Taffi* overruled *In re Mitchell*, 954 F.2d 557 (9th Cir.), *cert. denied* 506 U.S. 908, 113 S.Ct. 303, 121 L.Ed.2d 226 (1992), which had held that, generally, vehicles are to be valued at the price the creditor was likely to receive upon disposition of its collateral. In *Taffi*, the court held that, in cases in which the debtor is going to retain the collateral,

"value has to be the fair market value . . . [of the collateral].

"The fair market value is not 'replacement value' because the [collateral] is not being replaced. The fair market value is the price which a willing seller under no compulsion to sell and a willing buyer under no compulsion to buy would agree upon after the property has been exposed to the market for a reasonable time."

96 F.3d at 1192.

In practice, under *Mitchell*, wholesale value had become the prevalent valuation standard for cars. FMCC argues that, by

implication, *Taffi's* reversal of *Mitchell* must mean that retail valuation should now be the standard. The term "retail" is generally understood to mean the prices paid by buyers who purchase vehicles from automobile dealers. *Taffi* did not explicitly answer the question of what markets should be considered in determining fair market value.

After I took this matter under advisement, the Supreme Court decided *In re Rash*, —— U.S. ——, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997). The Court agreed with *Taffi* and provided further guidance on the meaning of fair market value, holding that fair market value is the price "a willing buyer *in the debtor's trade, business, or situation* would pay a willing seller to obtain property of like age and condition." —— U.S. ——, ——, n. 3, 117 S.Ct. 1879, 1885, n. 3 (emphasis added).

The Court also noted, however,

> "that replacement value, in this context, should not include certain items. For example, where the proper measure of the replacement value of a vehicle is its retail value, an adjustment to that value may be necessary: A creditor should not receive portions of the retail price, if any, that reflect the value of items the debtor does not receive when he retains his vehicle, items such as warranties, inventory storage, and reconditioning." *Id.* at —— n. 6, 117 S.Ct. at 1886 n. 6.

█ In view of the *Rash* decision, I conclude that, in this case, valuation should be based on prices paid in the market that is accessible to the debtors, which includes, without limitation, sales by dealers to the public, auctions open to the public, and sales between private parties.[1] That market is broader than the "retail" market. One must then deduct from the prices realized at such sales the value added by reconditioning, warranties, and the cost of other services or additions provided by the seller. *Rash*, —— U.S. at ——, 117 S.Ct. at 1886–87.

█ The term "fair market value" reflects the cash price that a willing buyer would pay a willing seller in an arms-length transaction, free of any compulsion or duress. The evidence indicates that an automobile dealer's selling price may be higher than it would be for a simple cash sale of the vehicle[2] if the dealer gives the buyer a trade-in allowance that is higher than the trade-in vehicle's actual value or if the dealer is required to make financing concessions or pay a third party to provide concessions. The evidence also indicates that the seller dealer may be willing to sell the vehicle at a lower price than it would charge for a simple cash sale of the vehicle if the buyer purchases mechanical and/or credit life/disability insurance or agrees to financing terms and has credit-worthiness such that the dealer is able to make a profit from the financing. For instance, the testimony in this case was that, generally, used vehicles are sold "as is" and the debtor is given the opportunity to purchase a mechanical warranty. Such warranties cost the dealer $300–$500, and the dealer sells the warranty for $800–$1,200, thus making a $500–$700 profit. In essence, to determine the true cash amount of a dealer's sale, one would have to adjust the price to eliminate the effect of these extra profit and cost items. This is similar to the recognized process in real property valuations in which adjustments are made to the price of comparable sales if the seller provided financing concessions.

The valuation evidence submitted in this case consisted of the following. Anthony Brady, who has eighteen years of experience in the car industry, eleven of which involved working as an automobile appraiser, testified that he valued the truck at $8,603 and the Celebrity at $2,315. Robert Wilson, a used car dealer who has many years experience in the automobile retail industry, including being involved in the sales of several thousand used cars and trucks, testified that, in his

---

1. There is no evidence that the debtors' trade, business or situation is such that they have access to the wholesale market. If they did, under *Rash*, the valuation analysis would focus on values in the wholesale market.

2. A simple cash sale of the vehicle means a sale for cash (no financing provided or required as part of the transaction), without a trade-in, and without the buyer purchasing any additional products, such as disability, life or mechanical insurance, in conjunction with the sale.

opinion, the fair market value of the truck is $5,600 in its current condition and the fair market value of the Celebrity is $1,200. On cross-examination, he testified that he had these additional opinions with respect to the truck: (1) a dealer could sell the truck for $6,200 if the dealer reconditioned and otherwise prepared the truck for a retail sale; and (2) the actual cash value that a wholesaler or dealer would pay for the truck is $4,500. The Kelley Auto Market Report Blue Book (Jan.–Apr.1997, Western ed.) ("Blue Book") values the truck at $6,250 wholesale and $9,740 retail[3] and the Celebrity at $2,700 wholesale and $4,760 retail. Mr. McElroy testified to values identical to those expressed by Mr. Wilson, although he said that he reached his conclusion based upon his review of advertisements for like vehicles and was unaware of Mr. Wilson's opinion. He further testified that in July 1996, he sought offers from dealers for the truck and was offered $5,000.

I find Mr. Wilson's testimony more persuasive than Mr. Brady's.[4] The biggest problem with Mr. Brady's valuation technique is that it relies primarily on advertised asking prices, not actual sales prices.[5] He does not determine the actual sales price of the advertised units. His rationale for using asking prices, rather than actual sales prices, is that dealers advertise vehicles at a reasonable price because the purpose of the advertisement is to induce potential customers to come to the dealer's business. If the price is too high, prospective customers will not come to look at the vehicle. Mr. Brady did not testify to any empirical evidence or publications to support his theory.[6] The Blue Book suggests the contrary. It states that "the actual selling price may vary substantially" from the dealer asking price. *See* p. 5, n. 2. Mr. Wilson testified that generally dealers price vehicles in order to allow room for bargaining because buyers expect to bargain. With respect to advertisements placed by private parties, Mr. Brady testified that sellers sometimes start high, but they lower their prices within two to three months. Although Mr. Brady used advertisements over a few month period, his method will not necessarily capture the final asking price of the buyer because the seller may not run advertisements for the entire period and, even if the seller did that, the seller's final

3. The Blue Book explains its use of the terms "wholesale" and "retail" as follows:
   "WHOLESALE VALUES are based on clean vehicles fully reconditioned and ready for resale with acceptable mileage as indicated by the zeros on the mileage charts.
   "SUGGESTED RETAIL VALUES represent Kelley Blue Book's estimated dealer asking price. The actual selling price may vary substantially."
   Exhibit A. According to Mr. Brady, the Blue Book defines wholesale as the amount a dealer can expect to pay for a particular type of vehicle and assumes that it is in the condition described above.

4. I am not prepared to totally reject Mr. Brady's testimony for two reasons. First, he did actual research regarding vehicles of the type at issue. Second, according to Mr. Brady's testimony, his method is accepted by the insurance industry in establishing the value of vehicles. Insurance companies have every incentive not to overvalue vehicles.

5. Mr. Brady's unwillingness to seek actual sales prices is understandable. It became clear from the evidence that it would be extremely difficult for an appraiser to determine the actual sales price of vehicles sold by dealers because one would have to adjust the actual sales prices to

neutralize the effect of trade-in vehicle agreements, insurance policy sales, and financing concessions or profits. Mr. Brady testified that dealers will not provide such information because it would reveal business strategies and other confidential financial information. But determining actual sales prices is exactly what the court has to do under *Taffi* and *Rash*. Mr. Brady did not provide a good explanation for why he could not obtain information from private parties regarding actual sales prices and aspects of those sales that would require price adjustments to determine the cash price indicated by the sale.

Debtor's counsel argues that Mr. Brady's reliance on asking prices rather than completed sales is so flawed that the court should give no weight to the opinions he expressed. Mr. Brady has substantial relevant experience in the automobile industry. His reliance on asking prices, which would not normally be admissible to establish value, *see United States v. Smith*, 355 F.2d 807 (5th Cir.1966) (condemnation case), does not prevent him from expressing an admissible opinion. F.R.E. 703.

6. Mr. Brady's approach would be more credible if he had compared actual sales prices to advertised prices for a number of varied vehicles and found a small or non-existent gap.

advertisement may not be in the period of the advertisements reviewed by Mr. Brady.[7]

In addition to the flaw in Mr. Brady's methodology, he did not obtain enough information about some of the vehicles he used as comparables to determine if they were truly comparable. He did not obtain the mileage of many of the vehicles even though he testified that mileage affects value.

Mr. Wilson drove the vehicles as part of his investigation of their mechanical condition. Mr. Wilson has experience as a mechanic and he had his ASC certified mechanic with him for the test drive. Mr. Brady did not drive the vehicles; he relied solely on the debtors' response to his inquiry about whether the vehicles had any problems. Mr. Wilson discovered mechanical problems during his test drive of the truck, which he factored into his valuation; Mr. Brady did not consider those problems. Often a person with vehicle expertise may notice mechanical problems by driving a vehicle that the owner, who lacks such expertise, has not noticed or does not recognize as significant. Mr. Wilson testified that the truck has a weak transmission, it pulls to the right when the brakes are applied, the brakes are marginal, and the air conditioning and cassette player do not work. He deducted $1,750 from his valuation for the cost of a rebuilt transmission; a new transmission for the truck will cost $2,800–$2,900. He also testified that the lowest cost to repair the air conditioner will be $200 because of the current Freon recovery requirements.

■ Based upon the evidence, I conclude that the value of the truck is $5,950 and the value of the car is $1,570. I determined the value of the truck by deducting $1,950 for the cost of the transmission and air conditioner repairs from Mr. Brady's value, which did not take those into account. I then gave Mr. Wilson's opinion twice as much weight as Mr. Brady's opinion and rounded off the number.

With respect to the car, no adjustments were made, but I gave Mr. Wilson's opinion twice as much weight as Mr. Brady's opinion and rounded off the number. I gave no weight to Mr. McElroy's opinion. I do not find credible Mr. McElroy's testimony that he coincidentally came up with the same values as his expert, Mr. Wilson. Further, his testimony was based totally on hearsay, he is not an expert who may rely on such hearsay, and offering prices are generally inadmissible to establish market value. *See United States v. Smith*, 355 F.2d 807, 811 (5th Cir.1966). I did not give any weight to the price a dealer had offered to purchase the truck from debtors, because that is a wholesale price and, under *Rash*, should not be used in valuing a vehicle these debtors are going to retain.

## II. GOOD FAITH

■ FMCC argues that debtors have not proposed their plan in good faith as required by 11 U.S.C. § 1325(a)(3), because this is debtors' second Chapter 13 within a short period and debtors have not demonstrated a sufficient change in circumstances. Successive filings can be evidence of lack of good faith absent a bona fide change in circumstances. *In re Metz*, 820 F.2d 1495 (9th Cir.1987).

Debtors argue that their circumstances did change between their first case and this case. The court dismissed debtors' first case because they missed a plan payment. They missed the plan payment because they had to pay $268 in unanticipated utility deposits that had not been included in their budget in their first case. In addition, their gross income has increased $133.

■ Although this is a close case, the facts that debtors are living on a very tight budget, that the utility deposits were unanticipated, and that debtors have had an increase in income, coupled with the absence of any

---

**7.** Mr. Brady's valuation of the 1987 Celebrity demonstrates the potential impact of using asking prices that may not even reflect the last asking price. He had five Celebrity automobiles listed on his appraisal. (Exhibit 6) He chose to disregard the two with the lowest value and average the three with the highest value. The Celebrity with the highest value, $2,800, had not yet been sold and had an asking price that was $1,100 higher than the second highest asking price. If the unsold Celebrity with the $2,800 price is excluded and the asking prices for the other four vehicles are averaged, the value with adjustments would be $1,664, rather than the $2,315 value expressed by Mr. Brady.

manipulation of the bankruptcy process, the absence of any gain by debtors as a result of the successive filings, and the absence of any of the other factors traditionally associated with lack of good faith [8] convinces the undersigned that, under the totality of the circumstances, debtors have proposed their plan in good faith.

## III. FEASIBILITY

In view of the increase in the value of the vehicles, which will probably result in an increase in the required plan payment, an adjourned confirmation hearing will be scheduled to determine whether the plan is feasible. At the hearing the court will use the income and expense budgets contained in debtors' Schedule I and J to determine feasibility with the following modifications.

First, with respect to income, Mr. McElroy will be required to produce his pay stubs from the last three months (or his last pay stub if it includes year-to-date figures) plus copies of his 1996 federal and state income tax returns, so that the proper amount of his income and his payroll deductions for taxes and social security can be determined. Mr. McElroy testified that he is working more overtime than is reflected on his Schedule I.

Second, even though debtors' Schedule I income increased $133 between the two filings, debtors' payroll deductions increased $243. Debtors must explain this increase in deductions. It does not make sense that their deductions would increase more than their increase in income, particularly given that debtors received a significant tax refund for 1996.

Third, given Mr. McElroy's testimony regarding the family food budget, coupled with the letter from his counsel received by the court on June 11, 1997, expenses will be calculated based on a food budget of $450.

### CONCLUSION

Debtors' 1987 Ford F–250 diesel truck is valued at $5,950 and their 1987 Chevrolet

Celebrity is valued at $1,570. Debtors proposed their plan in good faith. An adjourned confirmation hearing will be scheduled to determine whether the plan is feasible in view of the valuation of the vehicles, an accurate income figure and the increase in debtors' food budget.

This Memorandum Opinion shall constitute Findings of Fact and Conclusions of Law as required by Fed. R. Bankr.P. 7052 and they shall not be separately stated.

---

8. There are some inconsistencies in the budgets debtors filed in the two Chapter 13 cases. Having listened to Mr. McElroy's testimony regarding the cause of the variation, I believe that the numbers were good faith estimates and the minor variations were not the result of an attempt to mislead the court and interested parties.