**In re Chester JENKINS, Debtor.**

**Bankruptcy No. 397–31182–SAF–13.**

United States Bankruptcy Court,
N.D. Texas,
Dallas Division.

Sept. 17, 1997.

**690**

Bill Kuhn, Dallas, TX, for Red Bird Ford, Inc.

G. Michael Provine, Johnson & Johnson, P.C., Dallas, TX, for Debtor. .

## MEMORANDUM OPINION

STEVEN A. FELSENTHAL, Bankruptcy Judge.

Red Bird Ford, Inc., moves the court to lift the automatic stay for lack of adequate protection. 11 U.S.C. § 362(d)(1). Chester Jenkins, the debtor, opposes the motion. The court conducted a preliminary hearing on the motion on July 3, 1997, and a final hearing on July 31, 1997. The debtor filed his amended brief on August 15, 1997.

A motion to lift the automatic stay under 11 U.S.C. § 362 constitutes a core matter over which this court has jurisdiction to enter a final order. 28 U.S.C. §§ 157(b)(2)(G) and 1334. This order contains the court's findings of fact and conclusions of law as required by Bankruptcy Rules 7052 and 9014.

Red Bird Ford holds a perfected vendor's first lien in Jenkins' 1988 Mercury Sable automobile. Jenkins originally asserted that the vehicle had a value of $1,455.00. Red Bird Ford contends the value should be $4,000.00. With an inadequate value, Red Bird Ford maintains that Jenkins has failed to provide adequate protection.

This dispute requires that this court apply the Supreme Court's recent decision in *Associates Commercial Corp. v. Rash*, — U.S. ——, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997). The Court held in *Rash* that to determine the value of collateral for purposes of 11 U.S.C. § 1325(a)(5)(B), the bankruptcy court must find "the price a willing buyer in the debtor's trade, business, or situation would pay to obtain like property from a willing seller." —— U.S. at ——, 117 S.Ct. at 1884. The standard for determining value for a Chapter 13 plan "cram down" is not necessarily the same standard for determining adequate protection prior to plan confirmation. But, for this dispute, the parties agree that the value of this particular vehicle will not change between petition date and confirmation date. The court, accordingly, applies the willing buyer, willing seller test, since Jenkins proposes to retain and use the vehicle. —— U.S. at ——, 117 S.Ct. at 1886.

█ Louis R. McKernan, the president of Red Bird Ford, testified that he could sell the vehicle for $4,395.00. McKernan, who has 44 years in the automobile sales business, and who buys 100 to 150 vehicles per month, testified that he could purchase the vehicle at auction for about $1,200.00. He would then price the vehicle at $4,995.00. But, he recognized that the vehicle would need about $600.00 of repairs. Red Bird Ford then reasoned that it would net $4,395.00, before commissions and other costs of sales. In its prayer for relief, it requested a $4,000.00 value. The court infers from this request that the difference accounts for commissions and other costs of sales, which the Supreme Court intimates should be considered by the court. *Rash*, —— U.S. at —— n. 6, 117 S.Ct. at 1886 n. 6.

Bernard A. Siegal, an automotive technician and appraiser, testified that the vehicle should be valued at $1,700.00. For a 1988 Mercury Sable four door, 3.0 litre, V–6 in fair condition, which is Jenkins' model, the *NADA Official Older Used Car Guide* lists a retail price of $2,480.00, after deducting $820.00 for high mileage. Siegal surveyed the Dallas area marketplace, including advertisements in the *Dallas Morning News*, and also surveyed internet listings for the Southwest United States. He concluded that the $2,480.00 value was close to the middle of currently offered 1988 Sables in similar condition. He further testified that the repairs would cost about $780.00, resulting in a value of $1,700.00. He agreed with McKernan that the vehicle could be purchased at auction for $1,200.00.

Jenkins testified that he could not pay cash for the vehicle. McKernan explained that because the dealer had to arrange financing, the dealer would command a significant risk premium over the NADA value. Siegal agreed, but characterized the premium as "soaking" the consumer. McKernan and Siegal both testified that the NADA system presumes the buyer's ability to pay; that is, presumes a cash sale. This court understands *Rash* to also make that presumption. To have a "willing seller," a "willing buyer" must be an able buyer. Under the *Rash* standard, the marketplace transaction of a sale by a willing seller to a willing buyer presumes the buyer pays the seller. It does not presume that the seller also acts as a lending institution or a financing broker. The standard presumes the seller acts only as a seller. Accordingly, in valuing the vehicle, the court does not consider the risk premium imposed by a dealer who must also arrange financing for the buyer.

The *Rash* standard contemplates that the court consider adjustments for values the debtor does not receive when he retains the vehicle, such as warranties, inventory storage, and reconditioning. *Rash,* — U.S. at — n. 6, 117 S.Ct. at 1886 n. 6. In this case, the vehicle has excessive mileage for a vehicle of its age. Because excessive mileage presupposes future repair costs above the norm for a vehicle of that age, the willing buyer would expect a price adjustment. The NADA valuation manual instructs that the retail price be adjusted for this factor. Siegal testified that adjustment results in a value of $2,480.00, although McKernan testified he factored in the mileage in his price.

This case also contains the issue of reconditioning. The NADA instructions direct that an appropriate deduction be made for reconditioning costs incurred to put the vehicle in saleable condition. McKernan testified that the dealer could make the repairs for $600.00. Siegal testified the debtor would spend about $780.00 making the repairs. Thus the seller would spend between $600.00 to $780.00 to put the vehicle in saleable condition.

Both McKernan and Siegal testified that the vehicle could be purchased at auction for $1,200.00. The seller would then recondition the vehicle for $600.00 to $780.00. The seller would have a cost of about $1,800.00. The willing seller would not sell at cost. The willing seller would expect a profit.

Siegal testified that cash sales in the Dallas/Fort Worth Metroplex resulted in a mid-range price for a high mileage 1988 Mercury Sable of $2,480.00. McKernan concurred that he would sell the vehicle for cash at that price.

Siegal testified that the repair costs should be deducted from the purchase price. But the repairs must be made to put the vehicle in saleable condition. The seller must incur those costs. Those costs must be added to the seller's cost in acquiring the vehicle. In this case, that would put the seller's costs at $1,800.00. Under Siegal's approach, reducing the price by the amount of the repair costs, making the price $1,700.00, would result in no profit, and hence, no willing seller.

The value of the $2,480.00 results in a profit over the seller's costs of $1,800.00. The buyer is presumed to be an able buyer. The seller would then be a willing seller at that price. The price would reflect the standard community price for the vehicle, after repairs had been made and adjusted for excessive mileage. The buyer would then be a willing buyer at that price.

The court notes one other factor in the Supreme Court's standard. The court must consider "the debtor's trade, business or situation" in assessing a willing buyer. One could argue that the court must consider the debtor's ability to pay as part of the "the debtor's ... situation." Jenkins cannot pay cash. He would require financing. Under this "situation," the court has considered whether a financing risk premium should be added to the price, as Red Bird Ford requests. The court rejects that reading of the *Rash* standard.

The Supreme Court formulated the *Rash* standard for use in a Chapter 13 plan "cramdown" under 11 U.S.C. § 1325(a)(5)(B). Having presided over thousands of Chapter 13 cases, the court may reasonably infer that Chapter 13 debtors will not have an ability to

pay without financing. The debtor would be a financing risk. The cramdown provision of Chapter 13 contains both a valuation of property component and an interest rate component. Construction of the Bankruptcy Code is a holistic endeavor. *United Savings Assoc. v. Timbers of Inwood Forest Assoc.*, 484 U.S. 365, 370, 108 S.Ct. 626, 629–30, 98 L.Ed.2d 740 (1988). The court must read the Code to give all its provisions a consistent and coherent meaning. Under § 1325(a)(5), as construed by *Rash*, the court values property pursuant to the mechanism of 11 U.S.C. § 506. In this case, the court applies that value to the adequate protection analysis of § 362. But, when the debtor constructs the Chapter 13 plan, the debtor must provide sufficient payments to the secured creditor over time to assure that the creditor receives the value as of the effective date of the plan. § 1325(a)(5)(B). In determining those payments, the court, in effect, sets an interest rate. The repayment risk is a factor to consider in determining that rate. *See Green Tree Financial Servicing Corp. v. Smithwick*, 121 F.3d 211, 1997 WL 476410 (5th Cir.1997).

Since the debtor's financing repayment ability is an interest rate factor, the court reads the *Rash* standard of "the debtor's trade, business or situation" to require the court to analyze whether the debtor's use of the vehicle would impact the price of the vehicle. —— U.S. at ——, 117 S.Ct. at 1884. Jenkins uses the vehicle for transportation to and from work, and for daily transportation needs. He does not use the vehicle in his trade or business. Accordingly, the court places no special weight on this factor.

On this record, the court concludes that a willing buyer in the debtor's situation would pay $2,480.00 to obtain this 1988 Mercury Sable from a willing seller.

Jenkins urges this court to accept the Supreme Court's invitation to enunciate "a simple rule of valuation." *Rash*, —— U.S. at ——, 117 S.Ct. at 1886. The practice in this district had been to use the midpoint between a "retail" and "wholesale" value, typically based on NADA data. The court had understood that the rule had been accepted in the local marketplace. But McKernan testified that it did not fairly account for a high risk lending situation typical of a Red Bird Ford used car buyer. He testified that he "accepted" the standard because his attorney told him the court expected a standard. In any event, the Supreme Court has rejected that approach. *Rash*, —— U.S. at ——, 117 S.Ct. at 1886. But McKernan, Jenkins and Siegal all recognized the wasteful, unnecessary and counterproductive expenses involved in continually litigating the issue.

The court suggests that the debtor and vehicle creditor bar negotiate a rule using the following factors: Determine the NADA "retail" value, with a high mileage adjustment, if applicable. Determine the seller's cost to obtain the vehicle. Add to that cost the reconditioning costs, if any, to put the vehicle in saleable condition. Compare the two figures. If they result in a reasonable spread, use the NADA retail price. If they do not result in a reasonable spread, negotiate an agreed value. Unfortunately, even this approach requires debtor and creditor time and expense. But, over time, a more definitive rule may evolve.

Based on these findings of fact and conclusions of law, adequate protection payments shall be based on a vehicle value of $2,480.00. That value shall also be used for Chapter 13 plan purposes should Jenkins decide to retain and use the vehicle. Failure to make adequate protection payments based on this value shall result in a lifting of the automatic stay.

Counsel for the parties shall prepare an order consistent with these findings of fact and conclusions of law.