**In re Derrill Richard GLUECK Leslie Fay Glueck, Debtors.**

**Bankruptcy No. 98–52667.**

United States Bankruptcy Court, S.D. Ohio, Eastern Division.

Aug. 12, 1998.

---

5. This assumes that such an argument is later made in the face of 11 U.S.C. § 507(d).

William A. Semons, Columbus, OH, for Debtors.

Frank M. Pees, Worthington, OH, Chapter 13 Trustee.

David G. Korn, Irving B. Marks, Columbus, OH, for Household Automotive Finance Corp.

### ORDER ON VALUATION OF MOTOR VEHICLE

DONALD E. CALHOUN, Jr., Bankruptcy Judge.

The matter is before the Court for consideration of the Chapter 13 plan filed by Debtors Derrill Richard Glueck and Leslie Fay Glueck ("Debtors"), and the objection to confirmation filed by Household Automotive Finance Corp. ("Household"). The remaining matters to be decided by the Court concern Debtors' proposed valuation of a 1995 Ford Windstar motor vehicle ("the Windstar"), subject to a validly perfected lien in favor of Household, and the proper interest rate to be paid on the secured portion of Household's claim, in accordance with 11 U.S.C. § 1325(a)(5)(B).

This Court is vested with jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the General Order of Reference entered in this district. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B) and (L).

### I. Findings of Fact

The facts with respect to the matters before the Court are not in dispute. On or about September 25, 1997, Debtor Derrill R. Glueck entered into a retail installment contract and security agreement ("the Contract") for the purchase of the Windstar. The Contract was assigned to Household by the seller of the Windstar. Mr. Glueck financed the purchase of the Windstar by borrowing $16,416.49 at an interest rate of 22.95%. Debtors made one payment after taking possession of the Windstar, and subsequently filed their petition for relief under Chapter 13 of the Bankruptcy Code on March 19, 1998.

Debtors' Chapter 13 plan of reorganization calls for monthly payments to the Chapter 13 trustee in the sum of $376.55, with a proposed dividend to unsecured creditors of 10%. Debtors' Chapter 13 plan includes a proposed interest rate of 10% per annum for secured claims whose holders reject the plan (such as Household), or at the contract rate of interest, whichever is less. In their Schedule D–Creditors Holding Secured Claims, Debtors scheduled an obligation to Household in the amount of $16,416.49, however, Debtors valued the Windstar at $12,350.00, resulting in an unsecured claim to Household in the amount of $4,066.49.

Household filed its objection to confirmation of Debtors' Chapter 13 plan arguing, among other things, that the Windstar was undervalued, and that the proposed cram down interest rate of 10% was insufficient to provide a market rate of interest. Household asserts that the Windstar should be valued at $14,100.00, the retail value set forth in the N.A.D.A. Official Used Car Guide for April 1998, and that the contract interest rate of 22.95% should be paid on the secured amount of Household's claim.

### II. Conclusions of Law

Pursuant to their proposed Chapter 13 plan, Debtors are attempting to retain the Windstar over the objection of Household. The Court is therefore required to review the proposed plan in accordance with 11 U.S.C. § 1325(a)(5)(B), commonly referred to as the "cram down provision". In order for Debtors to "cram down" Household's secured claim over its objection, the proposed Chapter 13 plan must provide that Household retains the lien securing its claim, and that "the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim..." 11 U.S.C. § 1325(a)(5)(B)(ii).

Under the Local Bankruptcy Rules in this district, valuation of an automobile for cram down is determined by calculating the average of the wholesale and retail values of the vehicle, as stated in a nationally recognized car valuation guide, or by considering other admissible evidence of value. L.B.R. 3012–1(d)(3). The method for valuation of motor vehicles was recently addressed in *Associates Commercial Corp. v. Rash*, — U.S.——, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997). There is no question that valuation of motor vehicles

for purposes of § 1325(a)(5)(B) is now governed by *Rash*. However, the "edict" of the Supreme Court in *Rash* left ample room for interpretation and dispute. While the Supreme Court may have intended to provide some level of certainty as to the appropriate method for valuation of a motor vehicle for cram down purposes, *Rash* may have created more questions than answers.

It is far simpler to rule out improper methods of motor vehicle valuation after *Rash* than to determine the proper method. In *Rash*, the debtors filed a petition for relief under Chapter 13 of the Bankruptcy Code, and proposed a Chapter 13 plan whereby the holder of the lien on the debtors' truck would be paid based on the foreclosure value of the truck, as opposed to the "replacement value" as argued by the lien holder. The bankruptcy court ruled that the appropriate value of the truck for purposes 11 U.S.C. § 1325(a)(5)(B) was the wholesale value, or the amount that the creditor would obtain if the truck was repossessed and sold. *In re Rash*, 149 B.R. 430 (Bankr.E.D.Tex.1993). The district court affirmed the bankruptcy court's decision, but the Court of Appeals for the Fifth Circuit reversed, and ruled that the truck should be valued based on its "replacement value." The Fifth Circuit Court of Appeals granted the debtors' request for an *en banc* rehearing, and affirmed the decision of the district court, thereby determining that the proper valuation of the debtors' truck for purposes of 11 U.S.C. § 1325(a)(5)(B) was the wholesale value. *Matter of Rash*, 90 F.3d 1036, 1060 (5th Cir.1996)(*en banc* ).

The United States Supreme Court reversed the *en banc* decision of the Fifth Circuit Court of Appeals, and · held that "§ 506(a) directs application of the replacement—value standard." *Rash*, —— U.S. at ——, 117 S.Ct. at 1882. The Supreme Court in *Rash* discussed three different standards adopted by Courts of Appeals for valuing secured claims for cram down under § 1325(a)(5)(B): (1) replacement value; (2) mid-point between foreclosure value and replacement value; and (3)foreclosure or wholesale value. *Rash*, —— U.S. at ——– ——, 117 S.Ct. at 1883–1884. In determining the proper method for valuation of automobiles for cram down, the Supreme Court analyzed 11 U.S.C. § 506(a), with particular emphasis on the second sentence of that section: "Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." The first sentence of 11 U.S.C. § 506(a) "tells us that a secured creditor's claim is to be divided into secured and unsecured portions, with the secured portion of the claim limited to the value of the collateral." *Rash*, —— U.S. at ——, 117 S.Ct. at 1884. The Supreme Court found the Fifth Circuit's use of foreclosure or wholesale value to have "rendered inconsequential the sentence that expressly addresses how 'value shall be determined'." *Rash*, —— U.S. at ——, 117 S.Ct. at 1885. The Supreme Court held that "replacement value" must be applied in order to give full meaning to § 506(a), especially with respect to the distinction between a debtor retaining or surrendering property *Id.*

The Supreme Court in *Rash* rejected the Fifth Circuit's foreclosure standard approach to valuation for purposes of cram down under § 1325(a)(5)(B). The Supreme Court also rejected the Seventh Circuit's approach to valuation at the mid-point between foreclosure value and replacement value as set forth in *Matter of Hoskins*, 102 F.3d 311, 316 (7th Cir.1996). The Supreme Court also rejected the "ruleless approach allowing use of different valuation standards based on the facts and circumstances of individual cases" as set forth in *In re Valenti*, 105 F.3d 55, 62–63 (2d Cir.1997). *Rash*, —— U.S. at ——, n. 5, 117 S.Ct. at 1886, n. 5.

■ Now that this Court has discussed the approaches rejected by *Rash*, it must grapple with applying an "acceptable" approach. For purposes of valuation pursuant to § 1325(a)(5)(B), this Court must determine the "replacement value" of the relevant collateral. "In sum, under § 506(a), the value of property retained because the debtor has exercised the § 1325(a)(5)(B) 'cram down' option is the cost the debtor would incur to obtain a like asset for the same 'pro-

posed...use'." *Rash,* —— U.S. at ——, 117 S.Ct. at 1886. In an apparent attempt to give bankruptcy courts guidance as to this "technique" of valuation, the Supreme Court, in a footnote, states as follows:

> Our recognition that the replacement-value standard, not the foreclosure-value standard, governs in cram down cases leaves to bankruptcy courts, as triers of fact, identification of the best way of ascertaining replacement value on the basis of the evidence presented. Whether replacement value is the equivalent of retail value, wholesale value, or some other value will depend on the type of debtor and the nature of the property. We note, however, that replacement value, in this context, should not include certain items. For example, where the proper measure of the replacement value of a vehicle is its retail value, an adjustment to that value may be necessary: A creditor should not receive portions of the retail price, if any, that reflect the value of items the debtor does not receive when he retains his vehicle, items such as warranties, inventory storage, and reconditioning... Nor should the creditor gain from modifications to the property—e.g., the addition of accessories to a vehicle—to which a creditor's lien would not extend under state law.

*Rash,* —— U.S. at ——, n. 6, 117 S.Ct. at 1886, n. 6.

While the Supreme Court specifically rejected the *Valenti* "ruleless approach allowing use of different valuation standards based on the facts and circumstances of individual cases", bankruptcy courts in the aftermath of *Rash* have been unable to reach a consensus as to the meaning of "replacement value." In yet another footnote, the Supreme Court seems to have given a further clue to defining "replacement value" by referring to *Rash* footnote number 6, and equating replacement value to "fair market value" as defined by *In re Taffi,* 96 F.3d 1190 (9th Cir.1996)(en banc): "[O]ur use of the term replacement value is consistent with the Ninth Circuit's understanding of the meaning of fair market value; by replacement value, we mean the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition..." *Rash,* —— U.S. at ——, n. 2, 117 S.Ct. at 1883, n. 2.

In *In re Russell,* 211 B.R. 12 (Bankr. E.D.N.C.1997), the court held that the starting point for valuation of automobiles would be the retail value as defined by the National Automobile Dealers Association guide ("N.A.D.A."), asserting that value to most accurately reflect the "replacement value standard as set forth by ... *Rash.*" *Russell,* 211 B.R. at 12–13. In *In re Roberts,* 210 B.R. 325 (Bankr.N.D.Iowa 1997), the court noted that it had previously utilized the "replacement value test" as set forth by the Eighth Circuit in *In re Trimble,* 50 F.3d 530, 531–32 (8th Cir.1995). The *Roberts* court noted that the creditor's proof of claim constituted *prima facie* evidence of the validity and amount of its claim under Fed. R. Bankr. P. 3001(f), that the debtor had failed to rebut the *prima facie* validity of the bank's proof of claim, and the bank's proposed valuation was supported by the N.A.D.A. guide.*Roberts,* 210 B.R. at 331.

The next interpretation of *Rash* was *In re McElroy,* 210 B.R. 833 (Bankr.D.Or.1997), holding that "valuation should be based on prices paid in the market that is accessible to the debtors, which includes, without limitation, sales by dealers to the public, auctions open to the public, and sales between private parties. That market is broader than the 'retail' market." *McElroy,* 210 B.R. at 835. However, the *McElroy* court determined the valuation of the relevant motor vehicles through the use of appraisal testimony, not from a reference to any valuation guide.

In *In re Franklin,* 213 B.R. 781 (Bankr. N.D.Fla.1997), the court ruled that the appropriate starting point for valuation of motor vehicles for cram down purposes was the mid-point between retail and wholesale values "based on a recognition that such a value more closely approximates a price available in an open market rather than a purely retail market..." *Franklin,* 213 B.R. at 783. Two subsequent cases disagreed with the conclusion in *Franklin,* and held that retail value is the appropriate starting point for determination of "replacement value" under *Rash. In re Gates,* 214 B.R. 467, 471 (Bankr.

D.Md.1997); and *In re Jenkins*, 215 B.R. 689, 692 (Bankr.N.D.Tex.1997).

In *In re Younger*, 216 B.R. 649 (Bankr. W.D.Okla.1998), the court considered the *Russell, Franklin*, and *McElroy* decisions, noted that it would be impractical to require expert testimony in order to determine valuation under *Rash*, and concluded that the appropriate starting point for determining "replacement value" was the average of wholesale and retail values set forth in the relevant N.A.D.A. used car guide. This approach was recently adopted in *In re Oglesby*, 221 B.R. 515 (Bankr.D.Colo.1998).

After reviewing the cases that have attempted to interpret and apply *Rash*, it is clear that the bankruptcy bar needs, at a minimum, a "starting point" for determining valuation of automobiles for cram down under § 1325(a)(5)(B). The *Rash* decision did not provide a definitive starting point. Instead, the Supreme Court determined it best to leave "to bankruptcy courts, as triers of fact, identification of the best way of ascertaining replacement value on the basis of the evidence presented." *Rash,* — U.S. at ——, n. 6, 117 S.Ct. at 1886, n. 6. The Supreme Court hinted at the proper way to determine this starting point by adopting the Ninth Circuit's definition of fair market value ("the price a willing buyer in the debtor's trade, business, or situation would pay a willing seller to obtain property of like age and condition"), and equating that definition with "replacement value". *Rash,* — U.S. at ——, n. 2, 117 S .Ct. at 1884, n. 2, citing *Taffi, supra*. It would have been a simple matter for the Supreme Court to rule that "retail value" was the appropriate means for valuation of an automobile for cram down. However, in the already infamous footnote number 6 of the *Rash* opinion, the Supreme Court chose not to make that ruling. In fact, the *Taffi* court found that "replacement value" was not synonymous with "fair market value" inasmuch as the collateral "is not being replaced." *Taffi*, 96 F.3d at 1192. The Supreme Court adopted the *Taffi* "fair market value" definition, noting that the *Taffi* court apparently viewed it to be incompatible with "replacement value" as defined by other courts. *Rash,* — U.S. at ——, n. 2, 117 S.Ct. at 1884, n. 2.

■ In the experience of this Court, debtors in Chapter 13 proceedings, when faced with the need to purchase an automobile, do not routinely make that purchase from an automobile dealership. There are numerous other sources for debtors to obtain automobiles at lower costs, avoiding the overhead costs inherent in purchases from automobile dealerships. Debtors are able to purchase automobiles at auctions, from private individuals, from used car lots, from family members, or from rental car companies, just to name a few options. That market is clearly broader than a purely retail market. *McElroy*, 210 B.R. at 835. The Court believes that a willing "non-dealership" seller would accept, in many cases, a lower price for a comparable vehicle than would an automobile dealership. While it would be easier for this Court to accept the analyses of the courts that equate "retail value" with "replacement value", the Court does not believe this to be mandated by *Rash*. The Court finds that "retail value" and "replacement value" are not synonymous. *See, Franklin,* 213 B.R. at 783; *Younger*, 216 B.R. at 657; *Oglesby*, 221 B.R. at 519.

■ The Court finds that it would be prohibitively costly to require expert testimony for determination of value of every automobile in Chapter 13 proceedings. This Court agrees with the courts in *Franklin, Younger,* and *Oglesby* that have adopted, as a starting point, the average of retail and wholesale values for cram down under § 1325(a)(5)(B). *Rash* defines "replacement value" as exclusive of warranties, storage, and other items, thereby requiring a discount from retail value. A debtor's inability to regularly access the wholesale market requires an upward adjustment from wholesale value. Used vehicle guide books provide objective and authoritative evidence of retail and wholesale values. Many such guide books exist, and the Court does not believe it appropriate to rule that a specific used vehicle guide should be deemed authoritative. The Court will consider any such guide books presented by the parties as evidence of relevant values. This Court is not setting the average of retail

and wholesale as the *per se* value for purposes of cram down under § 1325(a)(5)(B), but is merely establishing that as a starting point for the analysis. The Court will consider any additional evidence presented by the parties probative of the value of the relevant automobile.

■ In the case before the Court, the parties stipulated to the Windstar's wholesale and retail values according to the N.A.D.A. guide book, as $11,750.00 and $14,100.00, respectively. The starting point for valuation of the Windstar is therefore $12,925.00, the average of the two values. The only witness presented by the parties was a regional sales manager from Household who testified as to the relevant N.A.D.A. values, but did not testify as to any other basis for adjusting the value in this particular situation. Without any additional evidence having been presented, the Court finds that the value of the Windstar for cram down under 11 U.S.C. § 1325(a)(5)(B) is $12,925.00.

The remaining matter for the Court to decide is the appropriate cram down discount, or interest rate [1] for payment to Household on the secured portion of its claim under 11 U.S.C. § 1325(a)(5)(B). Debtors' Chapter 13 plan proposed to pay an interest rate of 10% on the secured portion of Household's claim, and Household objected to this interest rate as being insufficient. The testimony of the witness from Household indicated that based on the Debtors' credit history, Household's current interest rate would be in a range between 18.95% and 24.95%. Debtors' contract rate of interest is 22.95%. In *Rash,* the secured creditor did not object to the proposed cram down interest rate, and the Supreme Court did not provide assistance for setting an appropriate interest rate.

11 U.S.C. § 1325(a)(5)(B)(ii) requires that a secured creditor receive payments that provide the present value of the secured amount of its claim. In determining the appropriate interest rate, this Court must begin its analysis with *Memphis Bank & Trust Co. v. Whitman,* 692 F.2d 427 (6th Cir.1982). In *Memphis Bank,* the Sixth Cir-

cuit stated that it would be inappropriate to arbitrarily establish an interest rate for cram down under § 1325(a)(5)(B), but instead "bankruptcy courts should use the current market rate of interest used for similar loans in the region." *Memphis Bank,* 692 F.2d at 431. In making this determination, the Court must "assess interest on the secured claim for the present value of the collateral...in order not to dilute the value of that claim through delay in payment. In effect, the law requires the creditor to make a new loan in the amount of the value of the collateral rather than repossess it, and the creditor is entitled to interest on his loan." *Memphis Bank,* 692 F.2d at 429.

The Sixth Circuit subsequently ruled that "the most equitable rate to establish in this type of situation is the prevailing market rate of interest on similar types of secured loans at the time of allowance of the creditor's claim and the confirmation of the plan in bankruptcy with a maximum limitation on such rate to be the underlying contract rate of interest." *In re Colegrove,* 771 F.2d 119, 123 (6th Cir.1985). The use of the "current market rate" of interest for cram down under 11 U.S.C. § 1225(a)(5)(B)(ii), which is identical to § 1325(a)(5)(B)(ii), was also adopted in *U.S. v. Arnold,* 878 F.2d 925 (6th Cir.1989). The *Arnold* court noted that the contract interest rate maximum set forth in *Colegrove* was applicable only for fully secured creditors who were not required to write-down any portion of a loan. *Arnold,* 878 F.2d at 929, 930.

■ In light of *Memphis Bank, Colegrove* and *Arnold,* this Court must identify the appropriate interest rate to be paid on Household's allowed secured claim based on the current market rate of interest for similar loans in the region. Household's claim is partially unsecured, so the contract rate maximum set forth in *Colegrove* does not apply. *Arnold, supra.* In order to provide the secured creditor with the present value of its claim, Debtors must provide a stream of payments that would be equivalent to the

---

1. For the sake of clarity, the Court will refer to "interest rate" though "discount rate" or "capi-

talization rate" may be more appropriate terms.

present value of a lump sum payment of the secured amount of the claim. While an interest rate based on the prime rate, or a similar indicator of the rate needed to satisfy a true present value analysis, would appear to more closely comply with the requirements of § 1325(a)(5)(B), the Court cannot justify use of such a "cost of funds rate" in light of *Memphis Bank's* directive to set the "current market rate of interest used for similar loans in the region." *Memphis Bank,* 692 F.2d at 431.

In this case, Debtors have proposed an interest rate of 10% on the secured amount of Household's claim, well below the contract rate of interest. The Court must determine whether the appropriate interest rate for cram down is tied to the lender's policies and the credit risks associated with the specific debtors, or if interest rates offered by automobile lenders, irrespective of the credit history of the relevant loan applicant, should apply. The only additional guidance provided by *Memphis Bank* is a notation that "bankruptcy courts are generally familiar with the current *conventional* rates on various types of consumer loans." *Memphis Bank,* 692 F.2d at 431 (emphasis added). This notation does not mandate use of "conventional rates", nor does it define "conventional rates."

In *Matter of Stanley,* 216 B.R. 929 (Bankr. S.D.Ohio 1997), the court was presented with a case similar to the one currently before this Court. In *Stanley,* an undersecured automobile lender's contract rate of interest was 21%, however, the bankruptcy court held that for cram down under 11 U.S.C. § 1325(a)(5)(B), the appropriate interest rate to be paid on the secured portion of the lender's claim was 9% as proposed by the debtor, and supported by the Chapter 13 trustee. *Stanley,* 216 B.R. at 930–931. Although the automobile lender argued that the "current market rate" and "similar loans" language of *Memphis Bank* required an interest rate that would otherwise be offered to high risk borrowers within the region, the bankruptcy court disagreed, stating that such an argument "eliminates any substantial difference between market rates and contract rates." *Stanley,* 216 B.R. at 932. The court

stated that it was "generally familiar with the current conventional rates on various types of consumer loans", and found that "9 percent currently reflects the market rate for automobile loans in this region" and "no special circumstance exists for deviating from the current 9 percent market rate." *Stanley,* 216 B.R. at 932.

■ Contrary to the holding in *Stanley,* this Court believes that the "current market rate" and "similar loans" language of *Memphis Bank* requires the Court to establish an interest rate available to borrowers with similar credit histories to that of the relevant debtors. Any other finding would effectively negate the language in *Memphis Bank* quoted above. Additionally, this Court does not believe that setting an interest rate based on the borrowers' credit history would necessarily eliminate a difference between "market rate" and "contract rate", as expressed in *Stanley.*

In light of *Memphis Bank, Arnold* and *Colegrove,* interest rates offered to low risk borrowers are not necessarily appropriate for cram down under § 1325(a)(5)(B). Other circuits have adopted a "coerced loan" approach, consistent with *Memphis Bank,* for determining the appropriate cram down interest rate for § 1325(a)(5)(B). *See, General Motors Acceptance Corp. v. Jones,* 999 F.2d 63 (3d Cir.1993); *In re Hardzog,* 901 F.2d 858 (10th Cir.1990). The various approaches to determining the appropriate cram down interest rate were analyzed in a recent article, David G. Epstein, *Don't Go and Do Something Rash About Cram Down Interest Rates,* 49 Ala. L.Rev. 435 (1998):

> Accordingly, in applying "value, as of the effective date of the plan," bankruptcy courts should endeavor to leave the secured creditor as well off as if it had been paid the amount of its secured claim in cash. The cram down interest rate should reflect what the secured creditor would have earned had it taken that cash and reinvested it in loans with terms comparable to the terms proposed by the debtor's plan and with risks comparable to the risks presented by the debtor's nonpayment.
>
> In most cases, there will be evidence of *relatively comparable* transactions. In

other cases, the plan's extreme terms or the debtor's extreme credit history will require that the bankruptcy court derive an interest rate from a combination of some base rate and an additional risk factor. And, in still other cases, bankruptcy courts may conclude that the rate in the contract is the most credible evidence of what the secured creditor would have earned had it been paid a cash amount equal to the value of its secured claim and reinvested that cash in a loan comparable to the terms and risks presented by the debtor's plan.

Epstein, 49 Ala. L.Rev. at 468.

This Court finds that it would be difficult, and violative of the *Memphis Bank* rule against setting an "arbitrary" rate, to set "some base rate" and additional risk factor as suggested above. However, under *Memphis Bank,* the risk factor involved with Debtor's credit history, and the lender's rates for similar transactions within the region must be reflected, and necessarily result in deviating from the interest rate offered to ordinary risk borrowers.[2] As with value, the Court finds that it would be impractical, on a routine basis, to obtain expert testimony as to interest rates in "relatively comparable transactions".

The remaining approach, set forth by the Third Circuit in *Jones,* approves use of the contract rate of interest for cram down under § 1325(a)(5)(B) if the creditor fails to present adequate evidence that the market rate of interest is in excess of the contract rate. However, if the debtor presents a plan with a proposed cram down interest rate below the contract rate, the court should require the debtor to present evidence that the creditor's current market rate of interest is below the contract rate. *Jones,* 999 F.2d at 70–71. This approach results in a "rebuttable presumption" that the contract rate of interest is appropriate for cram down under § 1325(a)(5)(B). Other courts have adopted the "rebuttable presumption" that contract interest rates should be used for cram down. *See, e.g., Matter of Smithwick,* 121 F.3d 211 (5th Cir.1997); *United Carolina Bank v.*

*Hall,* 993 F.2d 1126 (4th Cir.1993); *Koopmans v. Farm Credit Services of Mid-America, ACA,* 102 F.3d 874 (7th Cir.1996). Such an approach would provide the creditor of a "coerced loan" with an interest rate similar to the rate that it could obtain for loans with similar risk levels in the region. This approach appears to be consistent with *Memphis Bank.*

This Court finds that evidence of the relevant creditor's recent loan rate for similar loans within the region will be instrumental for setting the proper cram down interest rate. Absent such lender specific evidence, the contract rate of interest can be introduced as evidence of the appropriate market rate of interest for similar loans within the region, assuming that the loan was obtained in the relevant region. If the parties present credible evidence that the market rate of interest for similar loans is different than the contract rate, the Court will adjust the cram down interest rate accordingly. In many cases, an interest rate below the contract rate will be appropriate due to the reduced risk of default associated with a conduit payment, and discharge of a debtor's other debts through the bankruptcy proceeding. A seemingly relevant source of evidence would be the interest rate available for redemption financing in the local industry. The Court is aware that a "forced loan" of 100% of the value of an automobile is not customary in the industry, and produces additional risks to lenders. However, the Court must be able to provide some practical approach, consistent with *Memphis Bank,* in reviewing the multitude of cases dealing with this issue.

In this case, Debtors presented no testimony or evidence concerning the market rate of interest that was available for borrowers with similar credit histories, but simply proposed an arbitrary interest rate of 10% for cram down under § 1325(a)(5)(B). Absolutely no support was provided for this rate, and the Court cannot accept such an arbitrary rate in light of *Memphis Bank.* The only evidence requiring an adjustment of the contract rate of interest, to accurately

---

**2.** It is difficult for the Court to claim "familiarity" with "conventional" interest rates in light of the array of financing incentives currently available to automobile buyers.

reflect the current market interest rate for similar loans, came from Household's witness who testified that the current market rate of interest for similar loans *ranged from 18.95% to 24.95%*. The Court believes that the reduced risk associated with Debtors' payments to the Chapter 13 trustee, and discharge of debts on completion of their Chapter 13 plan supports the use of the interest rate at the low end of Household's "range", and will set 18.95% as the interest rate to be paid on the secured portion of Household's claim under § 1325(a)(5)(B).

Based on the foregoing, it is hereby

ORDERED that pursuant to 11 U.S.C. § 1325(a)(5)(B), the Windstar will be valued at $12,925.00, and the interest rate on the secured portion of Household's claim will be set at 18.95%.

IT IS SO ORDERED.