**In re Jeffrey Dene RENZELMAN, Betty Jo Renzelman, Debtor.**

**Bankruptcy No. 98–42594.**

United States Bankruptcy Court, W.D. Missouri, Kansas City Division.

Dec. 1, 1998.

Stephen B. Strayer, Liberty, MO, for petitioner.

T. Christian Cox, Kansas City, MO, for GMAC, respondent.

*MEMORANDUM OPINION*

ARTHUR B. FEDERMAN, Bankruptcy Judge.

Debtors Jeffrey and Betty Jo Renzelman filed a Chapter 13 bankruptcy petition on June 22, 1998. They scheduled a 1992 GMC Yukon (the Yukon) as an asset of their bankruptcy estate, and General Motors Acceptance Corporation (GMAC) as the secured creditor. Mr. and Mrs. Renzelman's bankruptcy schedules reflect that GMAC has a secured claim in the amount of $11,272.00 and an unsecured claim in the amount of $2,367.00. GMAC filed a proof of claim on July 17, 1998, for a secured claim of $12,-950.00 and an unsecured claim of $768.78. Debtors objected to the claim on the ground that $12,950.00 does not represent the re-

placement value of the Yukon. A hearing was held on November 2, 1998. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B) over which the Court has jurisdiction pursuant to 28 U.S.C. § 1334(b), 157(a), and 157(b)(1). The following constitutes my Findings of Fact and Conclusions of Law in accordance with Rule 52 of the Federal Rules of Civil Procedure as made applicable to this proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure. For the reasons set forth below, I will sustain Mr. and Mrs. Renzelman's objection to the claim of GMAC, and I will allow the claim as a secured claim in the amount of $11,471.25 and an unsecured claim in the amount of $2,247.53.

There is no factual dispute. The parties agree that the Yukon has an N.A.D.A. Official Used Car Guide (the Blue Book) retail value of $12,075 and a Blue Book wholesale value of $9,787.00. GMAC argues that it is entitled to the Blue Book retail value of the Yukon because the debtors are keeping the vehicle. Debtors argue that replacement value is equal to Blue Book retail value decreased by 10 percent. The issue for this Court is what, if any, reduction in Blue Book retail value is allowed if debtors wish to retain the collateral.

Both parties rely on *Associates Commercial Corporation v. Rash.*[1] In *Rash,* the Supreme Court held that the value of property retained by a debtor is the cost that debtor "would incur to obtain a like asset for the same 'proposed ... use.' "[2] The Supreme Court stated that a simple rule of valuation is needed " 'to serve the interests of predictability and uniformity.' "[3] Given the goal of a simple rule of valuation articulated in *Rash,* it at first blush appears that Blue Book retail value is the replacement value dictated by the Court. However, the simple rule of valuation is complicated by footnote 6. Footnote 6 provides:

Our recognition that the replacement-value standard, not the foreclosure-value standard, governs in cram down cases leaves to bankruptcy courts, as triers of fact, identification of the best way of ascertaining replacement value on the basis of evidence presented. Whether replacement value is the equivalent of retail value, wholesale value, or some other value will depend on the type of debtor and the nature of the property. We note, however, that replacement value, in this context, should not include certain items. For example, where the proper measure of the replacement value of a vehicle is its retail value, an adjustment to that value may be necessary: a creditor should not receive portions of the retail price, if any, that reflect the value of items the debtor does not receive when he retains his vehicle, items such as warranties, inventory storage, and reconditioning.... Nor should the creditor gain from modifications to the property—e.g., the addition of accessories to the vehicle—to which a creditor's lien would not extend under state law.[4]

Mr. and Mrs. Benzelman argue that footnote 6 should be applied to reduce the Blue Book retail value of the Yukon by 10 percent, since GMAC will not have to provide warranties, reconditioning, cleaning or detailing, dealer preparation, gas and oil, or consultation services. Debtors also direct this Court to *In re Glueck.*[5] In *Glueck,* the Court surveyed cases decided since *Rash* for guidance on the proper way to determine replacement value. The *Glueck* Court opted for an average between retail value and wholesale value as a starting point.[6] A 10 percent reduction in Blue Book retail value is almost the average between retail and wholesale, or foreclosure, value. However, the Supreme Court in *Rash* rejected the mid-point between wholesale and retail value as a valuation approach.[7] The Supreme Court also rejected an approach that would use different valuation

---

1. —— U.S. ——, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997).

2. *Id.,* —— U.S. ——, 117 S.Ct. at 1886 (citations omitted).

3. *Id.* (citations omitted).

4. *Id.,* —— U.S. ——, 117 S.Ct. at 1886–87 n. 6.

5. 223 B.R. 514 (Bankr.S.D.Ohio 1998).

6. *Id.* at 519–20.

7. —— U.S. ——, 117 S.Ct. at 1886.

standards based on the facts and circumstances of each case.[8] In light of the restrictions in *Rash*, as well as the guidance in footnote 6, this Court agrees with the *Glueck* Court that debtors need a "starting point" for determining replacement value.[9] The 10 percent reduction proposed by debtors gives too much credit to footnote 6, since the items not provided would not amount to such a value. And, as stated, a 10 percent reduction would approximate the mid-point between wholesale and retail value, a position that was rejected in the text of the Supreme Court's opinion in *Rash*. The starting point in this Court will be Blue Book retail value decreased by 5 percent. I note that many of the services provided by a dealer, such as warranties, dealer preparation, gas and oil, inventory storage, or reconditioning, are only provided if a debtor buys a car from a dealer. However, as the *Glueck* Court suggested, debtors in Chapter 13 proceedings do not necessarily purchase their cars from a dealership.[10] For example:

> Debtors are able to purchase automobiles at auctions, from private individuals, from used car lots, from family members, or from rental car companies ... a willing "non-dealership" seller would accept, in many cases, a lower price for a comparable vehicle than would an automobile dealership.[11]

Since debtors do have access to "non-dealership" sellers, Blue Book retail value may not be synonymous with replacement value. But the cost of bringing in expert witnesses in every case to project where, and from whom, each debtor might hypothetically replace his automobile is contrary to the goal of establishing a simple rule of valuation " 'to serve the interests of predictability and uniformity.' "[12] I will, thus, assume that, on average, Chapter 13 debtors would spend 5 percent less than Blue Book retail value if they were forced to replace their car. This is a starting point. If either the debtors or the secured creditors wish to present evidence as to a replacement value that varies from this as-

sumption, they are free to do so. In this case, neither party offered specific evidence as to the replacement value of the Yukon. Thus, the "5 percent rule" will apply here. I note, however, that Mr. and Mrs. Renzelman purchased the Yukon from Westfall–Odell Motors, Inc. and financed the purchase through GMAC on February 9, 1996. Though the Yukon was a used car at the time, the purchase was from a traditional automobile dealership.

In summary, I find that GMAC's total claim will be allowed in the total sum of $13,718.78. The agreed Blue Book retail value of the Yukon is $12,075. I also find that the replacement value of the Yukon is 5 percent less than the Blue Book retail value for a replacement value of $11,471.25. Therefore, GMAC's claim is secured in the amount of $11,471.25 and unsecured in the amount of $2,247.53.

An Order in accordance with this Memorandum Opinion will be entered this date.

---

**8.** *Id.*

**9.** 223 B.R. at 519.

**10.** *Id.*

**11.** *Id.*

**12.** —— U.S. ——, 117 S.Ct. at 1886 (citations omitted).