In re Bobby J. EDDINS, Amy R. Eddins, Debtors.

No. 06–10761–NLJ.

United States Bankruptcy Court, W.D. Oklahoma.

Oct. 17, 2006.

Gabriel Rivera, Oklahoma City, OK, for Debtors.

Bart A. Boren, Oklahoma City, OK, for Creditor.

## ORDER REGARDING VALUATION[1]

NILES L. JACKSON, Bankruptcy Judge.

Debtors filed their voluntary Chapter 13 petition and Chapter 13 Plan on April 11, 2006. Among the property listed in their schedules and included in their plan was a 2003 Dodge Durango ("Durango") and a 2000 Chrysler Sebring ("Sebring"). Both of these vehicles were subject to liens of Tinker Federal Credit Union ("TFCU").

Debtors' original plan listed TFCU's claims as secured claims subject to valuation and via boilerplate language in the

1. The court acknowledges with appreciation the able assistance of Oklahoma University School of Law extern Ruth Addison for her contributions in the research of the issue addressed by this order.

text of the plan asked the court to value the vehicles pursuant to 11 U.S.C. § 506(a).[2] According to the plan, the proposed amount of TFCU's allowed secured claim as to the Durango was $11,404 and as to the Sebring was $3,489.

Prior to the date of their § 341 Meeting of Creditors, Debtors filed an Amended Chapter 13 Plan, reflecting the same values for the Durango and the Sebring, but providing for a slightly higher monthly payment amount. At this juncture, TFCU filed its Objection to Confirmation and Motion to Determine Values. TFCU argued the plan was not feasible and objected to treatment of its secured claims, and additionally moved for a court determination of the value of its collateral. TFCU asserted the value of the Durango was $16,300 and the value of the Sebring was $7,925.

Subsequently, Debtors filed their separate Motion to Value, asserting the "average adjusted value" of the Durango was $13,450, and the "average adjusted value" of the Sebring, which was damaged and has not been maintained, was $5,500. Attached to their motion are Vehicle Summaries with NADA Values and repair estimates from two sources. TFCU then objected to the Amended Plan and to Debtors' Motion to Determine Value. TFCU again referenced lack of feasibility and improper treatment of its secured claims, and countered with values of $14,750 for the Durango and $7,925 for the Sebring.

On August 29, 2006, the court conducted a hearing on Debtors' Motion to Value. During the hearing the parties stipulated that the value of the Durango was $14,250, leaving only the value of the Sebring for determination by the court.[3]

Counsel for Debtors argued the Sebring is not in average condition but rather is in poor condition, and called Debtor Amy Eddins to testify regarding the Sebring. Mrs. Eddins represented that the Sebring has a dent in the driver's side front fender due to Debtors having wrecked the car in 2005, but being unable to repair it because they do not have the requisite $500 deductible.[4] Debtors have not notified their insurance company of this event, and did not assert the value of the Sebring should be adjusted to take into account the wreck-related damage.

However, Mrs. Eddins further testified that the front end shakes and jerks, that there are problems with the CV joint, and that during the three years they have owned the Sebring they have been unable to afford the recommended routine maintenance. According to Debtors' Exhibit D, prepared by Ranchwood Autoworks, it will cost $2,650.81 to remedy the deficiencies resulting from the deferred maintenance. Debtors rounded this amount to $2,500 for purposes of the valuation hearing, and argued the value of the Sebring should be reduced by $2,500.

Counsel for TFCU pointed out that when Mr. Eddins financed the Sebring, he

---

2. All references to the Bankruptcy Code, 11 U.S.C. §§ 101—1532, shall be to the version of the Code as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, and hereinafter will be by section number only unless otherwise required by the context.

3. Thereafter, on September 18, 2006, Debtors filed their second Amended Chapter 13 Plan. The second Amended Plan reflects the pro-

posed amount of TFCU's allowed secured claim as to the Durango is $14,250, the amount agreed by the parties, and as to the Sebring is $5,500, the amount urged by Debtors.

4. According to Debtors' Exhibit C, an estimate prepared by Ultimate Collision, it will cost $1,465.95 to repair the damage caused by the wreck.

agreed to keep the vehicle in good repair. Further, TFCU argued that the creditor should not bear the burden of deferred maintenance.

At the conclusion of the hearing, the court took the matter under advisement and granted the parties ten days in which to submit additional authorities if they so desired. The court has now reviewed the post-hearing submissions and the applicable law, and is prepared to rule.

The applicable law provides that:

> If the debtor is an individual in a case under chapter ... 13, such value with respect to personal property securing an allowed claim shall be determined based on the replacement value of such property as of the date of the filing of the petition without deduction for costs of sale or marketing. *With respect to property acquired for personal, family, or household purposes, replacement value shall mean the price a retail merchant would charge for property of that kind considering the age and condition of the property at the time value is determined.*

§ 506(a)(2)(emphasis added by the court). Because this subsection was added as a part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, the task of interpreting this subsection is an issue of first impression for this court.

The court's research reveals only two cases interpreting § 506(a)(2). The first is *In re Brown,* a Chapter 7 case decided April 24, 2006, in which the debtors sought to redeem their vehicle. *In re Brown,* No. 06–00197–JW, 2006 WL 3692609, 2006 Bankr.LEXIS 713 (Bankr.D.S.C. Apr. 24, 2006). Although *Brown* is a Chapter 7 redemption case, that court addressed § 506(a)(2) in the general context of valuing personal property in order to determine the allowed amount of a creditor's secured claim. *Id.* at *3, 2006 Bankr.LEXIS 713 at *7–*8. Thus, the analysis of the *Brown* court is applicable to the facts in this case.

In *Brown,* the court recognized that the allowed amount of a creditor's secured claim is to be determined by reference to § 506. *Id.* at *3, 2006 Bankr.LEXIS 713 at *6. The court further stated that pursuant to § 506(a)(2), when valuing a Chapter 13 debtor's personal property the court is to look to the personal property's replacement value at the petition date. *Id.* at *3, 2006 Bankr.LEXIS 713 at *7–*8. When dealing with "property acquired for personal, family, or household purposes," § 506(a)(2)'s second sentence narrowly defines replacement value as "the price a retail merchant would charge for property considering the age and condition of the property at the time value is determined." § 506(a)(2). According to the *Brown* court, "it appears that a retail value or retail price is the appropriate standard by which to determine replacement value." *Id.* at *3, 2006 Bankr.LEXIS 713 at *8. That statute further requires the court to consider the "age and condition of the property at the time value is determined." *Id.* at *3, 2006 Bankr.LEXIS 713 at *8–*9. The *Brown* court thus concluded that based upon the language included in the second sentence of § 506(a)(2), it appears the court is required to make adjustments to the replacement value "in light of the unique condition of the redeemed property." *Id.* at *3, 2006 Bankr.LEXIS 713 at *9. In that case, the only evidence submitted relating to the condition of the vehicle was a report stating the vehicle needed repairs that would cost $656. *Id.* The court determined the value under § 506(a)(2) by starting with the retail value cited by the creditor then deducting the $656 cost for repairs. *Id.*

The second case is *In re Mayland,* No. 06–10283, 2006 WL 1476927 (Bankr.

M.D.N.C., May 26, 2006). *Mayland* is also a Chapter 7 case in which the debtors sought to redeem their vehicle. *Id.* at*1. The *Mayland* court determined the issue before it was to "determine the proper valuation standard of a vehicle under Section 506(a)(2) of the Bankruptcy Abuse Prevention Consumer Protection Act of 2005...." *Id.* After a thorough analysis, the *Mayland* court concluded that:

> New Section 506(a)(2) makes clear it is applicable in both Chapter 7 cases and Chapter 13 cases.... Replacement value is now the standard for valuing claims for redemption purposes in Chapter 7 cases as well as Chapter 13 cases.

*Id.* at *3. That court deemed it appropriate to value the vehicle at issue in accordance with its definition of "replacement value." [5] *Id.* at *2.

In their post-hearing brief, Debtors urge the court to find that the valuation method previously relied upon in this jurisdiction is still applicable. That method is set forth in *In re Younger*, 216 B.R. 649 (Bankr.W.D.Okla.1998), and calls for using the average of NADA retail and wholesale as a starting point for fair market value of a vehicle, with the proviso that either party may submit evidence that might justify deviating up or down from that value. 216 B.R. at 656–57. With all due respect, based upon the clear language of § 506(a)(2) and the case law cited in this Order, this court is of the opinion that the *Younger* method of valuation is not consistent with what is called for by § 506(a)(2).

■ Having said that, this court agrees that "replacement value" within the meaning of § 506(a)(2) is the NADA retail value.[6] While this court agrees with TFCU's assertion that the creditor should not bear the burden of deferred maintenance, it appears that it has no choice but to consider evidence of deferred maintenance in making a determination of value under § 506(a)(2). Therefore, the NADA retail value is established as a guide for debtors, creditors and their counsel, as a starting point for valuation of vehicles under § 506(a)(2). Upon the objection of a party in interest, the court will conduct a valuation hearing during which other admissible evidence in support of a higher or lower value will be received.[7] In the absence of such evidence, the amount ascertained as the starting point will be determined to be the value of the vehicle within the meaning of § 506(a)(2).

■ Based upon the foregoing, the starting point for valuing the Sebring is the NADA retail value, adjusted for excessive mileage, of $7,925. Debtors presented evidence that it would cost $2,500 to make the repairs necessitated by their failure to maintain the vehicle. Creditor did not

---

5. The *Mayland* court reasoned that the values listed in the NADA Guide assume the vehicle "has been cleaned, repaired, reconditioned, and otherwise prepared for sale as an automobile dealer would normally do." *Id.* at *1. Thus, it believed a starting point value derived by deducting ten percent from the NADA retail value would account for the fact that debtors in bankruptcy rarely maintain their vehicles in peak condition. *Id.* That starting point value could then be adjusted up or down based upon evidence of particular characteristics that would affect the value, *e.g.* high mileage or special features. *Id.*

6. This court disagrees with the *Mayland* court's starting point of 90% of the NADA retail value, based on its belief that a debtor's failure to maintain the vehicle is surely encompassed by § 506(a)(2)'s requirement to consider the age and condition of the vehicle at the time of valuation.

7. This decision is not to be construed as condoning the trashing of vehicles prior to bankruptcy, and evidence of deliberate trashing will also be taken into account during the valuation process.

present any evidence in rebuttal. Accordingly, the value of the Sebring is $5,425.

IT IS SO ORDERED.